**Pamela EDWARDS, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 79A02–9901–CR–64.

Court of Appeals of Indiana.

Feb. 28, 2000.

Transfer Denied April 12, 2000.

Harold E. Amstutz, Lafayette, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, J.T. Whitehead, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

BAKER, Judge.

Appellant-defendant Pamela Edwards appeals her conviction for Exploitation of an Endangered Adult,[1] a Class A misdemeanor. Specifically, Edwards argues that: (1) the trial court erroneously admitted evidence of uncharged misconduct; (2) the trial court improperly allowed the State's expert witness to render an opinion that was speculative and prejudicial to Edwards; (3) the jury verdicts are inconsistent and, therefore, the trial court erred by not granting her motion for final judgment on the evidence; and, (4) the evidence is insufficient.

## FACTS

The facts most favorable to the verdict reveal that Edwards was raised by Marion Harris as her daughter. Following a stroke in 1993 and subsequent health problems, Edwards and her husband, co-defendant Leslie Edwards, acted as Harris' primary caregivers and were in contact with her daily.

In May 1996, Sherry Smitz, a nurse, referred Kimberly Baunach, a medical social worker, to Harris. Smitz was concerned that Harris, who was in her eighties, might need to be placed in a nursing home, as she was not properly taking her medication, her vision was poor, she was not eating as an insulin dependent diabetic

should, she was a fall risk, and she had periods of confusion. Record at 346. Thereafter, Baunach met with Harris on May 22, 1996. During their meeting, Harris' primary concern was with her failing eyesight. However, they also discussed obtaining assistance with her finances through the Area IV Agency on Aging and Community Services (Area IV), which offers assistance to the disabled, frail and elderly who have difficulty managing their money or may be victims of exploitation or fraud.

Baunach's concerns regarding Harris' finances arose after speaking with Edwards over the telephone on May 28, 1996. In that conversation, Edwards informed Baunach that Harris did not need assistance writing her checks, as she did that for her. However, Edwards was unaware of how much income was actually deposited into Harris' checking account. Edwards further informed Baunach that Harris appeared confused at times and kept changing her mind about going into a nursing home. R. at 350. Finally, Edwards told Baunach that Harris had signed over her house to Edwards approximately a year earlier. R. at 351.

On June 17, 1996, upon Baunach's request, Baunach and Smitz met with Harris and Edwards at Harris' home. Prior to Edwards' arrival, Harris expressed concern about "being kicked out of the house." R. at 350. The meeting appeared to focus on whether Harris needed to enter a nursing home and how her property would affect her qualification for Medicaid. At some point, Edwards commented to Harris that she was going to bring papers over the next day for Harris to sign over the house to her and Leslie. Edwards explained to Harris that she wanted her to do this in order to protect the house from Medicaid and keep it in the family. R. at 353. Baunach explained to Edwards that there may be penalties through Medicaid for conveying the property. On June 22,

---

1. IND.CODE § 35–46–1–12.

1996, Baunach further detailed the possible penalty in a letter to Harris, of which a copy was sent to Edwards, noting that if Harris were placed in a nursing home within thirty-six months of the conveyance, the value of the home would be credited against her and she would not receive full Medicaid benefits. R. at 559.

However, on June 18, 1996, Harris conveyed her home to Edwards and Leslie in their presence and in front of a notary. Interestingly, Edwards' sister was present but was unaware of what was occurring. Leslie obtained the deed from a local attorney and requested the presence of the notary. At the signing, the notary simply looked over the document and then told Harris that "this was a deed from you to the Edwards and here's where you sign it." R. at 398. Leslie then handed the document to Harris for her to sign. Harris had difficulty signing the deed because of her poor eyesight. Therefore, the notary printed her name below the signature line and then Leslie put the pen in Harris' hand and placed it on the line. Harris then signed the deed.

After this conveyance, Baunach referred Harris to Judy Davis, a money manager for Area IV. Davis subsequently met with Harris on July 18, 1996. When reviewing Harris' bank statement from recent months, she observed what she described as improprieties. R. at 124. For example, on the previous month's statement, she noted that in a twenty-six-day period, there appeared $988.00 worth of checks written to PayLess Supermarket. Moreover, on the back of many of the cancelled checks was a notation that $25.00 cash had been provided. Actually, one of the checks was written for $26.06 and, therefore, only $1.06 worth of groceries was purchased in addition to the cash received. R. at 125. Davis further noted that Harris had very few groceries at the time of her visit. Following their visit, Baunach and Davis suspected exploitation and agreed to report the situation to Adult Protective Services (APS).

Davis encountered Edwards and Leslie as she was leaving and explained to them what she had discovered and her plan to notify APS. Edwards responded that she suspected her sister. However, soon after Davis arrived home she received a phone call from Edwards. Edwards admitted that she had written some of the checks and asked Davis, "what is going to happen to me." R. at 128. Thereafter, fearing the presence of severe exploitation, Davis quickly contacted social security and assumed control of Harris' checking account through Area IV's bill payer program. R. at 128. Further, she contacted a lawyer at Legal Services to determine the ownership of Harris' house. As of July 1996, the property was still recorded under Harris' name. Davis was concerned because, while Harris emphatically insisted that the house was still hers and had not been turned over to anyone, she said that she did remember having to sign some papers. R. at 130, 132.

On July 22, 1996, Davis organized a meeting at Harris' home with Harris, Leslie and Edwards, as she was suspicious that something had happened with the house. Leslie responded to Harris' insistence that the house was still hers by saying, "you told us you wanted us to have the house." R. at 132. Harris retorted, "I do when I die, it is still my house." R. at 132. Leslie then remarked, "you knew what you were signing when you signed it." R. at 132. Leslie told Harris that they wanted to sell the house in order to take care of her. However, Davis then explained the possibly severe repercussions through Medicaid if they attempted to sell the house, especially considering Harris' potential need to enter a nursing home in the near future.

Despite these warnings, Edwards and Leslie recorded the deed on July 27 and then sold the property to David Bonham on August 5, 1996. Harris was present but took no part in the negotiations. Bonham purchased the property with cash, on an as is basis, and without having the

property appraised. The property was subject to a mortgage and real estate taxes. Further, clear title could not be had until two judgments pending against the Edwards had been settled. These liens were for $1612.75 to M & M Motors and $2429.06 to Lafayette Bank and Trust. After these costs, in addition to $600.00 for Harris to live in the home for one year, were taken out of the $25,000 purchase price, Edwards and Leslie received $13,-163.55 in cash from the sale of the house.

On the day of the sale, Edwards proceeded to purchase a car for $3000.00 cash. Soon thereafter, Edwards and Leslie went on vacation in Georgia. They also used the money to pay some of their debt, including money to their landlord and $700.00 to Leslie's uncle. In sum, they failed to save any of the proceeds for the sale of the house to take care of Harris' rent beginning in September 1997. R. at 543.

Harris continued to live in her home rent-free until September 1997. Sometime near the end of the one-year term, Leslie contacted Bonham and asked him not to evict Harris, offering to pay her rent. However, Bonham received no money from the Edwards. Thereafter, Harris paid Bonham $300.00 per month, an amount negotiated between Bonham and Legal Services, until May 1998. Within thirty-six months of the sale of the home, Harris was forced to enter a nursing home.

On September 24, 1997, the State charged Edwards with theft, a Class D felony, and exploitation of an endangered adult, a Class A misdemeanor. A jury trial commenced on October 7, 1998 and the following day, Edwards was found not guilty of theft but guilty of exploitation of an endangered adult. On October 26, 1998, Edwards filed a Motion for Final Judgment on the Evidence, which the trial court subsequently denied on November 18. The trial court similarly denied Edwards' Motion to Correct Errors on December 23, 1998. Edwards now appeals. Additional facts will be provided below as necessary.

## DISCUSSION AND DECISION

### I. Evidence of Prior Bad Acts

Edwards argues that the trial court erred in allowing into evidence checks written on Harris' account, as they were not part of the charged offenses.[2] Specifically, she asserts that these checks constituted evidence of uncharged misconduct in violation of Ind. Evidence Rules 404(b) and 403.

The admissibility of evidence is within the sound discretion of the trial court. *Dumes v. State*, 718 N.E.2d 1171, 1174 (Ind.Ct.App.1999), *clarified on reh'g*, 723 N.E.2d 460 (2000). Thus, we will not reverse the trial court's decision absent a showing of manifest abuse of that discretion resulting in the denial of a fair trial. *Id.* Further, we may affirm the trial court's action if it can be sustained on any

2. The following checks, allegedly written by Edwards in 1996, were admitted into evidence over Edwards' objection:

| | | |
|---|---|---|
| June 7 | PayLess | $117.79 |
| June 15 | PayLess | 98.18 |
| June 18 | PayLess | 58.53 |
| June 19 | PayLess | 25.29 |
| June 21 | PayLess | 77.73 |
| June 23 | PayLess | 31.79 |
| June 23 | Hills | 11.52 |
| June 24 | PayLess | 47.35 |
| June 25 | PayLess | 32.00 |
| June 25 | PayLess | 29.66 |
| June 26 | PayLess | 32.39 |
| June 27 | PayLess | 73.83 |
| June 28 | PayLess | 51.95 |
| June 29 | PayLess | 69.13 |
| June 31 | PayLess | 54.32 |
| June 31 | PayLess | 51.21 |
| July 1 | Revco | 29.99 |
| July 1 | PayLess | 34.20 |
| July 3 | PayLess | 103.23 |
| July 3 | PayLess | 50.24 |
| July 3 | PayLess | 26.77 |
| July 4 | PayLess | 28.65 |
| July 5 | Revco | 28.19 |
| July 9 | PayLess | 173.67 |
| July 10 | Edwards | 50.00 |
| July 18 | PayLess | 47.08 |
| July 20 | PayLess | 31.68 |

R. at 269–339.

legal theory supported by the record. *Utley v. Healy,* 663 N.E.2d 229, 232 (Ind.Ct. App.1996), *trans. denied.*

Evid. R. 404(b) provides in relevant part as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

Moreover, our supreme court has explained the standard for assessing admissibility of 404(b) evidence as follows:

> (1) the court must determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) the court must balance the probative value of the evidence against its prejudicial effect pursuant to Rule 403. When inquiring into relevance, the court may consider any factor it would ordinarily consider under Rule 402. These may include the similarity and proximity in time of the prior bad act to the charged conduct, and will presumably typically include tying the act to the defendant. But these factors are simply illustrative of the many aspects that may, depending on the context, be required to show relevance.

*Hicks v. State,* 690 N.E.2d 215, 221 (Ind. 1997).

■ With respect to the relevance of the checks, we initially observe that they were all negotiated during the time period in question, June and July 1996. Further, the checks were relevant to show the control Edwards exercised over Harris on a continuing basis and to show Edwards' scheme or plan to exploit her. Moreover, these checks evidenced Edwards' motive of financial gain rather than concern for Harris' well being. Thus, the checks were not admitted into evidence for the purpose of proving Edwards' propensity to commit theft or exploitation. *See Swanson v. State,* 666 N.E.2d 397, 398 (Ind.1996) ("The paradigm of such inadmissible evidence is a crime committed on another day in another place, evidence whose only apparent purpose is to prove the defendant is a person who commits crimes.").

■ Having determined that the checks were admitted for several proper purposes, we now must determine whether the trial court abused its discretion in determining that their probative value was not substantially outweighed by the danger of unfair prejudice. We observe that the evidence was highly relevant to rebut Edwards and Leslie's suggestion at trial that their control over Harris' home was authorized and not intended for their own financial gain. Under these circumstances, we are not persuaded that the trial court erred in determining that the probative value of the checks was not substantially outweighed by the risk of unfair prejudice.

■ Further, we note that this evidence was in effect cumulative, as Judy Davis had already testified as to the existence of many of the checks without any objection from Edwards. R at 124–28. Thus, even if we were to hold that the trial court abused its discretion in admitting the evidence, it would not amount to grounds for reversal. *Hicks,* 690 N.E.2d at 223 (holding that cumulative evidence is not grounds for reversal).

## II. Expert Testimony

■ Among her allegations of error, Edwards also claims that the trial court erred in allowing the State's expert witness, Wiley Sanders, to render an opinion as to the fair market value of the real estate on September 2, 1997. She argues that such opinion was speculative because the relevant time frame for an appraisal would have been between June and August 1996. Further, she notes that Sanders had never been on the property prior to

his appraisal and he observed at that time that substantial repairs had been made to the property in the recent past.

As already noted, the trial court has broad discretion in its determination on the admissibility of evidence, and we will not reverse such a ruling absent a manifest abuse of that discretion. *Dumes,* 718 N.E.2d at 1174. Further, we note that while evidence that is not relevant is inadmissible, Ind. Evidence Rule 402, relevant evidence is broadly defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ind. Evidence Rule 401. Once evidence is determined to be relevant, the trial court must determine whether the probative value is substantially outweighed by the danger of unfair prejudice. Evid. R. 403.

In the instant case, after considering argument and the State's offer to prove outside the presence of the jury, the trial court admitted Sanders' opinion. Sanders proceeded to testify that the fair market value of the house on September 2, 1997 was $57,300. R. at 552. He further opined that if the property was sold for a price of $25,000, it would be undersold. R. at 552. Thereafter, both Leslie and Edwards' attorneys vigorously cross-examined Sanders. Through cross-examination, the attorneys emphasized that the appraisal was done over a year after the alleged crimes took place, that Sanders had seen the property before the appraisal and that he had not spoken with anyone regarding what improvements had been made since the sale. Finally, Sanders agreed with Edwards' attorney that taking his 1997 appraisal of the property and applying it to the property as of June, July or August 1996 would require some speculation. R. at 557.

We cannot agree with Edwards that Sanders' opinion was speculative, as he simply appraised the property as of September 1997. He offered no opinion as to the value of the property on an earlier date.[3] Moreover, we find that Sanders' appraisal was at least marginally relevant to determining whether the house was undersold in August 1996. The fact that the house may have increased in value due to improvements simply goes to the weight of the evidence, not its admissibility. Further, we find that any unfair prejudice that this evidence may have potentially caused was diminished by counsel's effective cross-examination. Thus, we hold that the trial court did not abuse its discretion in allowing Sanders' appraisal of the property as of September 1997.

### III. Consistency of the Verdicts

■ Edwards next contends that the jury's verdicts are inconsistent and cannot be reconciled. Specifically, Edwards asserts that exploitation of an endangered adult requires proof of the same elements as theft, with the addition that an endangered adult is involved. Thus, she reasons that by determining she was not guilty of theft, the jury was precluded from finding her guilty of exploitation of an endangered adult. Therefore, she argues that the trial court erred in denying her motion for final judgment on the evidence, requesting that the court set aside the jury's verdict of guilty on the exploitation of an endangered adult count.

■ When reviewing the consistency of jury verdicts, we will take corrective action only when the verdicts are extremely contradictory and irreconcilable. *Jones v. State,* 689 N.E.2d 722, 724 (Ind.1997). Moreover, we will not attempt to interpret the thought process of the jury in arriving at its verdict, and perfect logical consistency is not required. *Id.*

3. When asked by Edwards' counsel, "Do you feel like you are speculating as to the value of the property on June, July 1996 based on your lack of information?" R. at 557. Sanders responded, "I haven't been asked for that value." R. at 557.

To convict a defendant of theft, the jury must find beyond a reasonable doubt that the defendant knowingly or intentionally exerted unauthorized control over property of another with intent to deprive the other person of any part of its value or use. I.C. § 35–43–4–2(a). On the other hand, to convict a defendant of exploitation of an endangered adult, the jury must find beyond a reasonable doubt that the defendant recklessly, knowingly or intentionally exerted unauthorized use of the personal services or property of an endangered adult for her own profit or advantage or for the profit or advantage of another. I.C. § 35–46–1–12(a).

In the present case, Edwards was charged with both theft and exploitation of an endangered adult based on her unauthorized exertion of control over Harris' home. If the jury found that Edwards did not intend to deprive Harris of any value or use of the home but that Edwards did exercise such control for her own profit or advantage or the profit or advantage of another, it could quite logically find her guilty of exploitation of an endangered adult and not guilty of theft. Therefore, we cannot say that the verdicts are inconsistent.

### IV. Sufficiency of the Evidence

■ Finally, Edwards argues that the evidence was insufficient to support her conviction. Specifically, she contends that the evidence shows that Harris was not incompetent to convey her home and, therefore, her control over Harris' property was not unauthorized.

Initially, we note our standard of review. When reviewing a claim of sufficiency of the evidence, we neither reweigh the evidence nor judge the credibility of witnesses. *Sanders v. State,* 704 N.E.2d 119, 123 (Ind.1999). Rather, we look only to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* If the evidence and inferences provide substantial evidence of probative value to support the verdict, we will affirm. *Id.* Final-

ly, we note that it lies within the jury's exclusive province to weigh conflicting evidence. *Robinson v. State,* 699 N.E.2d 1146, 1148 (Ind.1998).

Here, the evidence most favorable to the judgment reveals that Harris had suffered from periods of confusion since her stroke in 1993. Specifically, her family physician, Dr. Grayson Davis, testified that after her stroke her memory was seriously affected. R. at 226. He stated that she was confused and, in his opinion, "became incompetent after her stroke...." R. at 234. In March 1996, he opined that Harris was not competent to handle her social security income and on July 24, he signed a social security form to such effect. R. at 227, 232. Further, in May 1996, a nurse referred Baunach to Harris, noting that, among other things, Harris was not properly taking care of herself and had periods of confusion. Thereafter, suspecting exploitation, Baunach enlisted the help of Judy Davis from Area IV.

Davis explained at trial that Harris, beyond simply her near blindness, had difficulty comprehending things that she had to sign. R. at 131. Further, a local attorney refused to draw up a will for Harris because he felt she was not competent. R. at 158. We also note that soon after signing the deed, Harris told Davis that she had not turned her house over to anyone. Further, in a meeting with Davis and the Edwards, Harris insisted that the house was still hers. However, even after these protests from Harris, Edwards and Leslie sold the house. Finally, Leslie even testified that there were times when Harris was not competent. R. at 523, 547.

In light of this evidence, the jury could reasonably infer that Edwards took advantage of Harris' failing health and competence and, thus, that Edwards' control over Harris' home was unauthorized. Therefore, we decline Edwards' invitation for us to reweigh the evidence. We find that the evidence was sufficient to support

her conviction for exploitation of an endangered adult.

### CONCLUSION

In light of our resolution of the above issues, we hold that the trial court did not abuse its discretion by admitting the checks into evidence or by allowing Sanders to testify as to the property's value in September 1997. Further, the jury's verdicts were not inconsistent and the evidence was sufficient to support her conviction for exploitation of an endangered adult.

Judgment affirmed.

STATON, J., concurs.

SULLIVAN, J., concurs as to Parts II, III and IV and concurs in result as to Part I.