Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT:

**JUNE E. BULES**
Plymouth, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**BRIAN REITZ**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

TRAVIS L. CHIZUM,           )
                            )
    Appellant-Defendant,    )
                            )
      vs.               )    No. 50A04-1311-CR-560
                            )
STATE OF INDIANA,           )
                            )
    Appellee-Plaintiff.     )

APPEAL FROM THE MARSHALL SUPERIOR COURT
The Honorable Robert O. Bowen, Judge
Cause No. 50D01-1303-FB-29

**July 30, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

Travis Chizum appeals his convictions for dealing in methamphetamine as a class B felony, possession of methamphetamine as a class D felony, possession of chemical reagents or precursors with intent to manufacture as a class D felony, and maintaining a common nuisance, a class D felony. Chizum raises two issues, which we revise and restate as:

I.      Whether the court abused its discretion when it admitted evidence seized during the execution of a search warrant; and

II.     Whether the prosecutor committed misconduct by intimidating witnesses prior to trial.

We affirm.

## FACTS AND PROCEDURAL HISTORY

In January 2013, Plymouth Police Officer John Weir drove past 1008 North Plum Street in Plymouth, Indiana (the "Location"), and smelled the strong odor of ammonia emanating from a barn on the premises. Officer Weir had been working methamphetamine cases since 2005 and associated the odor with the manufacture of methamphetamine. Although Officer Weir would normally have called for other officers and performed a "knock and talk" at the Location, only two other officers were working because it was a Sunday, and accordingly he decided against doing so. Transcript at 74. Beginning on January 8, 2013, Officer Weir conducted surveillance on the barn, including logging license plate numbers of visiting vehicles and checking names to the pseudoephedrine purchase log. Due to his experience working methamphetamine cases, Officer Weir recognized many of the visitors.

2

On February 8, 2013, a vehicle was pulled over in which Brian Beeman was riding as a passenger. Beeman had a warrant out for his arrest and had drug paraphernalia in his possession when he was taken into custody. Beeman articulated to the arresting officer that, in exchange for not being cited for possession of paraphernalia, he would show the officer a location where there was "constant methamphetamine cooking" by Chizum and John Bobby. Appellant's Appendix at 26. Beeman told the officer "that he has been there and seen the old labs and that they cook up to 16 boxes a night." Id. He stated that this was where he procured his methamphetamine. He then took the officer to the Location. This information was given to Officer Weir.

On February 27, 2013, Officer Weir prepared an Affidavit for Search Warrant (the "Affidavit") containing the information provided by Beeman as well as the results of Officer Weir's surveillance of the Location and investigation resulting therefrom. The request was granted and a search warrant issued that same day. On March 7, 2013, the search warrant was executed.

On March 7, prior to the police executing the search warrant, Diane Watson and Jordan Bunton had visited the Marshall County Jail to see a couple of inmates and, upon leaving, they decided they wanted to get high and walked to the Location. While on the way there, they called and spoke with Chizum to make sure they could come over. When they arrived, Chizum and Adam Wagers were there, Watson paid forty dollars for approximately one-half of a gram of methamphetamine, and Wagers injected both Watson and Bunton with

3

the drug. While Watson and Bunton were at the Location, Kim Frazier arrived. At some point, Chizum received a call or text on his cell phone, and shortly thereafter he gave Frazier the keys to the Location and told her to lock up when she left. Chizum then left the Location.

Within a few minutes of Chizum leaving there was a knock at the door, and when Wagers went to answer it he saw that it was the police and alerted the others. Wagers attempted to climb out of a window in the back of the Location but was apprehended by officers, and the three females were found hiding under a vehicle parked in the back of the Location. The police observed a strong odor of chemicals in the building, and they accordingly ensured there were no other people inside and vacated the building except for two Indiana State Police officers who were members of the Chemical Lab Team and have special training in dealing with and disposing of methamphetamine chemicals and labs.

At the Location, the police recovered a large quantity of methamphetamine related items. Specifically, police discovered plastic zip lock type baggies, a scale, a hollowed out pen taped with a glass tube used to smoke methamphetamine, empty pseudoephedrine boxes and blister packs, hypodermic needles, coffee filters, and a coffee grinder containing a white powdery residue. Also present were lye and sulfuric acid, Coleman fuel, cold packs, salt, and empty lithium battery casings, as well as "crasher bags," which are plastic bags that are hung to allow the methamphetamine to filter from the liquid solvent. Transcript at 93, 112. There were at least twenty-three old hydrochloric gas generators and sixteen one-pot labs found. Also, a one-gallon pump type sprayer was found inside an oven, which was determined to be

4

an active methamphetamine lab. The contents of a plastic bag containing a glass vial which housed a cloudy liquid tested positive for methamphetamine, and the contents of another plastic bag containing five coffee filters also tested positive for methamphetamine. In addition, Watson was found to be in possession of a plastic bag containing a substance that tested positive for methamphetamine.

On March 14, 2013, the State charged Chizum with Count I, dealing in methamphetamine as a Class B Felony; Count II, conspiracy to commit dealing in methamphetamine as a class B felony; Count III, possession of methamphetamine as a class D felony; Count IV, possession of chemical reagents or precursors with intent to manufacture a controlled substance as a class D felony; and Count V, maintaining a common nuisance, a class D felony. On July 15, 2013, Chizum filed a Notice of Alibi Defense, and on July 22, 2013, the State filed its Objection to Defendant's Notice of Alibi. On July 22, 2013, Chizum filed a motion to suppress, and on August 28, 2013, a hearing was held on the motion and the matter was taken under advisement. The trial court denied the motion to suppress on August 30, 2013.

Also, on July 29, 2013, after Chizum filed his motion to suppress but prior to the hearing thereon, the State of Indiana filed an Amended Information. On August 29, 2013, the State filed a Notice of Intent to Introduce Laboratory Results. On September 11, 2013, the court held a hearing on the Notice of Alibi Defense and the State's Amendment of the Charging Information, and the court granted the State's motion to amend the charging

information and also ordered that Chizum be allowed to submit evidence regarding the facts in the notice of alibi but that no alibi instruction would be read to the jury.

On September 23, 2013, Chizum filed a Verified Petition for Appointment of Special Prosecutor and a separate Motion to Dismiss for State Misconduct (the "Motion to Dismiss"). Chizum's Motion to Dismiss alleged that "[t]he prosecutor has obstructed [Chizum's] access to witnesses by following, harassing, threatening, and arresting several of [Chizum's] witnesses." Appellant's Appendix at 43. On September 24, 2013, prior to the jury trial beginning, a hearing was held on the petition and Motion to Dismiss in which Tara Chizum, the sister of Chizum, testified via video camera from the Marshall County Jail due to being incarcerated. Tara testified regarding Prosecutor Nelson Chipman's interactions with her and other defense witnesses and the fact that certain defense witnesses had been recently arrested. The court denied both Chizum's petition and Motion to Dismiss.

That day, the court proceeded to hold a jury trial in which evidence consistent with the foregoing was presented. On September 25, 2013, the jury found Chizum guilty as charged. On October 16, 2013, the court sentenced Chizum to twenty years at the Department of Correction on Count I, dealing in methamphetamine, three years on Count III, possession of methamphetamine, three years on Count IV, possession of chemical reagents or precursors with intent to manufacture, and three years on Count V, maintaining a common nuisance, and

ordered that the sentences be served concurrently.[1]  Thus, Chizum received an aggregate

sentence of twenty years.  Additional facts will be provided below.

DISCUSSION

I.

The first issue is whether the court abused its discretion when it admitted evidence

seized during the execution of the search warrant.  Although Chizum originally challenged

the admission of the evidence through a motion to suppress, he now challenges the admission

of the evidence at trial.  Thus, the issue is appropriately framed as whether the trial court

abused its discretion by admitting the evidence.  See Jefferson v. State, 891 N.E.2d 77, 80

(Ind. Ct. App. 2008), trans. denied.  We review the trial court's ruling on the admission or

exclusion of evidence for an abuse of discretion.  Roche v. State, 690 N.E.2d 1115, 1134

(Ind. 1997), reh'g denied.  We reverse only where the decision is clearly against the logic and

effect of the facts and circumstances.  Joyner v. State, 678 N.E.2d 386, 390 (Ind. 1997), reh'g

denied.  Even if the trial court's decision was an abuse of discretion, we will not reverse if

the admission constituted harmless error.  Fox v. State, 717 N.E.2d 957, 966 (Ind. Ct. App.

1999), reh'g denied, trans. denied.  We may affirm a trial court's decision to admit evidence

seized as a result of the search based on any legal theory supported by the record.  Edwards v.

State, 724 N.E.2d 616 (Ind. Ct. App. 2000), trans. denied.

---

[1] The court ordered that Count II merge with Count I.

7

Chizum raises a number of challenges to whether the search warrant was supported by probable cause. Specifically, Chizum argues that: (A) probable cause had not been established to issue the search warrant; (B) even if the information contained in the Affidavit was enough to establish probable cause, the information was stale; and (C) even if the information establishing probable cause was not stale at the time the warrant was issued, probable cause had become stale by the time the officers executed the warrant. We address each of Chizum's arguments separately.

A.      Whether Probable Cause Was Established

Both the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution require probable cause for the issuance of a search warrant. State v. Shipman, 987 N.E.2d 1122, 1126 (Ind. Ct. App. 2013). This court has previously explained that "probable cause" is a fluid concept incapable of precise definition and must be decided based on the facts of each case. Id. In deciding whether to issue a search warrant, the task of the issuing magistrate is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit, there is a fair probability that evidence of a crime will be found in a particular place. Id.; see also Illinois v. Gates, 462 U.S. 213, 238, 103 S. Ct. 2317 (1983), reh'g denied. "A search warrant is presumed valid, and the burden is upon the challenger to rebut the presumption." Britt v. State, 810 N.E.2d 1077, 1080 (Ind. Ct. App. 2004).

8

The duty of a reviewing court is to determine whether the judge had a "substantial basis" for concluding that probable cause existed.  Shipman, 987 N.E.2d at 1126 (quoting State v. Spillers, 847 N.E.2d 949, 953 (Ind. 2006)).  A "substantial basis" requires the reviewing court, with significant deference to the judge's determination, to focus on whether reasonable inferences drawn from the totality of the evidence support the determination of probable cause.  Id.  We review the trial court's substantial basis determination *de novo*, but we nonetheless afford significant deference to the judge's determination as we focus on whether reasonable inferences drawn from the totality of the evidence support that determination.  Id.  We consider only the evidence presented to the issuing judge, not after-the-fact justifications for the search.  Id.; see also Jaggers v. State, 687 N.E.2d 180, 182 (Ind. 1997) (noting that a reviewing court must confine its review to the "evidence presented to the issuing magistrate and not *post hac* justifications for the search") (citing Seltzer v. State, 489 N.E.2d 939, 941 (Ind. 1986)).  In determining whether an affidavit provided probable cause for the issuance of a search warrant, doubtful cases should be resolved in favor of upholding the warrant.  Shipman, 987 N.E.2d at 1126.

The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

9

The text of Article 1, Section 11 of the Indiana Constitution contains nearly identical language. Jackson v. State, 908 N.E.2d 1140, 1143 (Ind. 2009). These constitutional principles are codified in Ind. Code § 35-33-5-2, which details the information to be contained in an affidavit for a search warrant. Spillers, 847 N.E.2d at 953.

At the time the Affidavit was filed, Ind. Code § 35-33-5-2(a) provided in relevant part:

[N]o warrant for search or arrest shall be issued until there is filed with the judge an affidavit:

    (1)    particularly describing:

        (A)    the house or place to be searched and the things to be searched for; or

        (B)    particularly describing the person to be arrested;

    (2)    alleging substantially the offense in relation thereto and that the affiant believes and has good cause to believe that:

        (A)    the things as are to be searched for are there concealed; or

        (B)    the person to be arrested committed the offense; and

    (3)    setting forth the facts then in knowledge of the affiant or information based on hearsay, constituting the probable cause.

Ind. Code § 35-33-5-2(a) (2008) (subsequently amended by Pub. L. No. 170-2014, § 17 (eff. July 1, 2014)).  Also, if an affidavit used to establish probable cause is based on hearsay, the affidavit must either:

> (1)　contain reliable information establishing the credibility of the source and of each of the declarants of the hearsay and establishing that there is a factual basis for the information furnished; or

> (2)　contain information that establishes that the totality of the circumstances corroborates the hearsay.

Ind. Code § 35-33-5-2(b).

The Indiana Supreme Court has determined that uncorroborated hearsay from a source whose credibility is itself unknown cannot support the finding of probable cause to issue a search warrant.  See Jaggers, 687 N.E.2d at 182 (citing Gates, 462 U.S. at 227, 103 S. Ct. 2317)).  The trustworthiness of hearsay for the purpose of proving probable cause can be established in a number of ways, including where: (1) the informant has given correct information in the past, (2) independent police investigation corroborates the informant's statements, (3) some basis for the informant's knowledge is demonstrated, or (4) the informant predicts conduct or activity by the suspect that is not ordinarily easily predicted. Lanham v. State, 937 N.E.2d 419, 424 (Ind. Ct. App. 2010). These examples are not exclusive.  Id.  "Depending on the facts, other considerations may come into play in establishing the reliability of the informant or the hearsay."  Id.  One such additional consideration is whether the informant has made a declaration against penal interest.  Id.

11

Chizum argues that probable cause had not been established to issue the search warrant, asserting specifically that the State did not establish that the hearsay information provided by Beeman was trustworthy. Chizum urges that the State's argument that Beeman's credibility "was established because he was admitting wrongdoing" fails because he was "already in custody for illegal activity" and he was not subjected "to any additional criminal liability and [statements] were therefore not against his penal interest." Appellant's Brief at 11. He also argues that, to the extent the Affidavit relied upon the criminal histories of various individuals Officer Weir chronicled as frequenting the Location, "[t]he mere fact that certain people are seen frequenting a location does not establish probable cause that unlawful activity is occurring at that location." Id. at 12. He further maintains that the fact "that some of the people had purchased pseudoephedrine during the past several years does not establish probable cause that there is currently unlawful behavior at the location now." Id.

The State asserts that Beeman's statement to police was a statement against penal interest, noting specifically that while he was under arrest for possession of paraphernalia, which ranges in severity from a class A infraction to a class D felony, his statement was an admission to possessing methamphetamine, with a range of a class D felony to a class A felony. The State argues that Chizum's contention that Beeman's statement was not reliable because he was in custody "does not square with the 'common sense' understanding outlined by both this Court and the Supreme Court of the United States." Appellee's Brief at 14. The State further posits that although Beeman's statement alone sufficed, "Officer Weir had

12

conducted further investigation to buttress probable cause and corroborate Beeman's statement" by logging license plates and names of subjects visiting the barn. Id. And the State notes that the Affidavit "listed twenty people that had been visitors to the barn" who "combined for 621 attempted pseudoephedrine purchases in the past few years, eighty prior narcotics charges, 229 prior criminal charges in total, and forty-four total criminal sentences." Id. at 15. The State maintains that although "the specific dates of the individual pseudoephedrine purchases were not listed–instead ranges of the purchases for each individual were listed–each time period ended in February 2013, rendering the fair, plain reading of the [A]ffidavit to indicate that these purchases were ongoing." Id.

The circumstances known to the trial court in its determination of admissibility include Beeman's statement to police regarding "constant methamphetamine cooking" by Chizum, among others, occurring at the Location, and "that he has been there and seen the old labs and that they cook up to 16 boxes a night." The trial court also knew of Beeman's statements that he had purchased methamphetamine at the Location, as well as directing the police to the Location, as well as Officer Weir's investigation of the Location, which had been occurring for a month prior to the stop of Beeman. Appellant's Appendix at 26. The Affidavit, consisting of ten single-spaced pages, chronicled the results of Officer Weir's investigation, including a list of twenty individuals associated with the Location and noting their frequency of purchasing pseudoephedrine which he determined by examining "the NPLEX pseudoephedrine purchase logs." Id. Office Weir further noted in the Affidavit that

13

through his thirteen years of "training and experiences with Methamphetamine investigations," he recognized that the pseudoephedrine purchasing behavior exhibited by the twenty individuals was consistent with those of "Methamphetamine users/cooks or 'smurfs' (persons who buy [pseudoephedrine] to sell for a large profit or trade for Meth)." Id. Officer Weir also indicated that he observed the strong odor of ammonia emanating from a barn on the premises in January 2013. To the extent that the parties disagree as to whether Beeman's statement was trustworthy and reliable as a statement against penal interest, we need not examine this question because the trustworthiness of his statement was established by corroborating evidence procured by Officer Weir's investigation of the Location. Accordingly, we conclude that the Affidavit was supported by probable cause, and the trial court acted within its discretion when it admitted the evidence seized at the Location. See Scott v. State, 883 N.E.2d 147, 155-156 (Ind. Ct. App. 2008) (holding that information provided by a confidential informant "was sufficiently corroborated by the totality of the circumstances, including some additional police investigation and statements from concerned citizens consistent with the [confidential informant's] information" and that probable cause to search a residence therefore existed).

B. Whether the Information Establishing Probable Cause Was Stale at Issuance

"Time can be a critical requirement in determining probable cause." Mehring v. State, 884 N.E.2d 371, 377 (Ind. Ct. App. 2008) (quoting Williams v. State, 426 N.E.2d 662, 667 (Ind. 1981)), reh'g denied, trans. denied. "It is a fundamental principle of search and seizure

14

law that the information given to the magistrate or judge in the application for a search warrant must be timely." Id. The general rule is that stale information cannot support a finding of probable cause. Id. Rather, it gives rise to a mere suspicion, especially where the items to be obtained in the search are easily concealed and moved. Id. The exact moment when information becomes stale cannot be precisely determined. Id. Although the age of the information supporting an application for a warrant can be a critical factor when determining the existence of probable cause, our courts have not established a bright-line rule regarding the amount of time that may elapse between obtaining the facts upon which the search warrant is based and the issuance of the warrant. Id. (citing Breitweiser v. State, 704 N.E.2d 496, 499 (Ind. Ct. App. 1999) (citing Moran v. State, 644 N.E.2d 536 542 (Ind. 1994), reh'g denied)). "[P]robable cause is not determined by merely counting the number of days between the occurrence of the facts relied upon and the warrant's issuance." Id. Instead, whether the information is tainted by staleness must be determined by the facts and circumstances of each particular case. Id.

Chizum argues that even if the information contained in the Affidavit was enough to establish probable cause, the court still abused its discretion in issuing the warrant because the information was stale. Chizum states that "[s]tale information gives rise only to mere suspicion and not reasonable belief, especially when the evidence is easily concealed and moved." Appellant's Brief at 13. He argues that the Affidavit "contained information provided from Beeman on February 8, 2013 that he would show where constant

methamphetamine was being cooked" but that Beeman "did not disclose to the officer how he knew" this, nor "how recently he had been to the location or the number of times he had been there," and that "the trial court knew a minimum nineteen (19) days, if not more, had elapsed from the time officers obtained Beeman's information and the issuance of the search warrant" which "makes the information stale and the search warrant invalid." Id. at 13-14. He also maintains that the Affidavit contained "a laundry list of individuals Officer Weir observed frequenting the location between January 25, 2013 and February 2013" and "the number of times each person bought and/or attempted to purchase pseudoephedrine" and his or her criminal history, but "[a]bsolutely nothing in the [A]ffidavit provided the trial court with the timeliness of the purchases." Id. at 14.

The State argues that "items relating to the manufacture of methamphetamine would . . . not dissipate in the short amount of time" between when the information supporting the Affidavit was gathered and when the search warrant was issued, noting that such "remnants of manufacturing methamphetamine and all the trash . . . associated with it is going to be there unless they dispose of it" and indeed it was present when the search warrant was executed. Appellee's Brief at 17. The State maintains that the "litany of smurfs" contained in the Affidavit, as well as Beeman's statements that the Location "was used for 'constant Methamphetamine cooking' and that 'up to 16 boxes a night' were being cooked" created "[t]he reasonable inference . . . that Chizum's barn was being used as a 'constant' staging area for the production and consumption of methamphetamine," id. at 17-18, and that

16

"probable cause may continue for several weeks, if not months, of the last reported instance of suspect activity." Id. at 18 (quoting U.S. v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir. 1986)). The State also argues that "no intervening facts changed the initial circumstances that supported probable cause." Id. at 19.

The record reveals that on February 8, 2013, Beeman told police of "constant methamphetamine cooking" by Chizum among others occurring at the Location and "that he has been there and seen the old labs and that they cook up to 16 boxes a night." Appellant's Appendix at 26. This statement indicates that evidence of the manufacture of methamphetamine was not being disposed of as it accumulated. Officer Weir had been surveilling the Location, and he continued to do so for weeks after until February 20, 2013, a week prior to filing the Affidavit. Unlike money or drugs, the remnants of precursors in the manufacture of methamphetamine are not items that may be easily consumed and instead must be disposed of in some fashion. See Foster v. State, 633 N.E.2d 337, 345 (Ind. Ct. App. 1994), trans. denied. We conclude that the evidence supporting probable cause was not stale when the search warrant was issued. See Scott, 883 N.E.2d at 157 (holding that "[i]n light of the C.I.'s information that Scott was involved in ongoing methamphetamine manufacture, [the officer's] information regarding detecting the odor of ether at [the defendant's] residence within the previous two months was not stale").

C.    Whether Probable Cause Was Stale When Search Warrant Executed

17

Search warrants must be executed not more than ten days after the date of issuance. Ind. Code § 35-33-5-7(b)(1). This court has held that search warrants executed within the statutory ten-day period can be unconstitutional if the supporting probable cause dissipates before execution. Huffines v. State, 739 N.E.2d 1093, 1096-1097 (Ind. Ct. App. 2000), trans. denied. With respect to whether the information supporting a warrant was stale by the time the warrant was served, this court has held:

> Although the age of the information supporting an application for a warrant can be a critical factor when determining the existence of probable cause, our courts have not established a bright-line rule regarding the amount of time which may elapse between obtaining the facts upon which the search warrant is based and the issuance of the warrant. Instead, whether the information is tainted by staleness must be determined by the facts and circumstances of each particular case.

Smith v. State, 953 N.E.2d 651, 659 (Ind. Ct. App. 2011) (citing Scott, 883 N.E.2d at 157 (quoting Frasier v. State, 794 N.E.2d 449, 457 (Ind. Ct. App. 2003), reh'g denied, trans. denied)), trans. denied.

Chizum argues that the "delay of eight (8) days before the warrant was executed dissipated the information even more enhancing the staleness and therefore making the search invalid." Appellant's Brief at 15. He asserts that "[i]mportant factors to consider in determining whether probable cause had dissipated, rendering the warrant fatally stale, include the lapse of time since the warrant was issued, the nature of the criminal activity, and the kind of property subject to the search," id. at 14-15 (citing Ashley v. State, 251 Ind. 359, 367-368, 241 N.E.2d 264, 268-269 (1968)), and that there was "very little information

18

contained in the [A]ffidavit . . . that supports a determination that evidence of methamphetamine and /or methamphetamine manufacturing items would be found at the location on March 7, 2013 . . . ." Id. at 15. The State argues that for the same reasons discussed in part (B), "considering the type of evidence believed to have been at [the Location] this was not an unreasonable delay" because it "was a 'constant' process . . . ." Appellee's Brief at 20.

We agree with the State that the information contained in the Affidavit which, as noted above, was not stale at the time of issuance, was similarly not stale at the time the search warrant was executed. Again, there was evidence of constant methamphetamine manufacturing by Chizum and others at the Location, and evidence that Beeman had been there and seen the old labs and that observed up to 16 boxes a night being manufactured. Appellant's Appendix at 26. The Location was frequented by a multitude of individuals who frequently purchased pseudoephedrine and had criminal histories involving the use and manufacture of methamphetamine. The police executed the search warrant within the statutory ten-day period, and we cannot say that the evidence supporting probable cause had become stale between the issuance of the warrant and the date it was executed. We therefore conclude Chizum is not entitled to reversal on this basis.[2]

II.

---

[2] The State also argues that even if the warrant was invalid, the good faith exception applies and the evidence should not be excluded. However, because we so conclude we need not address this argument.

19

The next issue is whether the prosecutor committed misconduct by intimidating witnesses prior to trial. In reviewing a claim of prosecutorial misconduct, we determine: (1) whether the prosecutor engaged in misconduct, and if so, (2) whether that misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she should not have been subjected. Coleman v. State, 750 N.E.2d 370, 374 (Ind. 2001). The "gravity of peril" is measured by the "probable persuasive effect of the misconduct on the jury's decision, not on the degree of impropriety of the conduct." Id. When deciding whether a mistrial is appropriate, the trial court is in the best position to gauge the surrounding circumstances and the potential impact on the jury. Stephenson v. State, 742 N.E.2d 463, 482 (Ind. 2001), cert. denied, 534 U.S. 1105, 122 S. Ct. 905 (2002). A mistrial is "an extreme remedy granted only when no other method can rectify the situation." Overstreet v. State, 783 N.E.2d 1140, 1155 (Ind. 2003), cert. denied, 540 U.S. 1150, 124 S. Ct. 1145 (2004). The denial of a mistrial lies within the sound discretion of the trial court, and will be reversed only upon a finding of an abuse of discretion. Coleman, 750 N.E.2d at 375. An abuse of discretion occurs where the decision is clearly against the logic and effect of the facts and circumstances. Smith v. State, 754 N.E.2d 502, 504 (Ind. 2001).

Chizum argues that, as alleged in his Motion to Dismiss, the prosecutor "committed misconduct by harassing and intimidating witnesses prior to trial and by facilitating the arrest of all of the witnesses on [Chizum's] witness list a week to ten (10) days prior to trial." Appellant's Brief at 17. He contends that based on the testimony of Tara, discussed below,

"[c]ertainly driving back and forth from the hospital parking lot to an apartment complex next to a witness' apartment complex at approximately midnight repeatedly could be viewed as misconduct by intimidation" and that Prosecutor Holmes, who argued at the hearing, made statements that he was aware of Chipman approaching "Johnson and Frazier," which corroborated what Tara testified to at the hearing. Id. at 19. He urges that Chipman's "conduct placed Chizum in a position of grave peril by placing witnesses in fear to testify on his behalf" and "violated [his] right to a fair trial under the Due Process Clause of the Constitution." Id.

The State argues that "Chizum's entire argument is based on uncorroborated testimony provided by Tara–Chizum's incarcerated, methamphetamine-using sister," and that the court did not credit her testimony. Appellee's Brief at 24. The State also argues that even if the events occurred as Tara claimed "it would not have caused 'grave peril' to Chizum," noting that he does not cite authority regarding prosecutorial misconduct by harassing witnesses in this fashion. Id. The State contends that it is unclear why Chizum believes that a prosecutor cannot approach a listed witness prior to trial and that "there has been no claim of any impermissible conversations, much less impermissible threats." Id. at 26.

On September 23, 2013, Chizum filed separately a Verified Petition for Appointment of Special Prosecutor and a Motion to Dismiss, which alleged that "[t]he prosecutor has obstructed [Chizum's] access to witnesses by following, harassing, threatening, and arresting

21

several of [Chizum's] witnesses." Appellant's Appendix at 43. On September 24, 2013, prior to the start of the jury trial, a hearing was held on the petition and Motion to Dismiss. Chizum's attorney called Tara Chizum, the defendant's sister, who testified via video camera from the Marshall County Jail due to being incarcerated. She testified that at about 11:45 p.m. to midnight on September 12, 2013, she witnessed a car drive out of the hospital parking lot into the apartments next to hers and then back to the hospital parking lot and back about three times and that she recognized Prosecutor Chipman as the driver of the vehicle.

She testified that she heard that Larry Frazier, who was another witness for Chizum, had been out shopping and that Chipman had followed him to three different stores, and when Larry asked Chipman why he was following him Chipman responded that he was looking for Frazier's wife, Kim Frazier. Tara further testified that Kim Frazier had said that Chipman had just been asked to leave her and her husband's apartment complex by the maintenance man after Chipman had been sitting there for three to four hours. She testified that another witness, Melissa Johnson, called her and said that Chipman had shown up at her hotel room and that when she asked him how he found her there he told her that he "hunted [her] down." Transcript at 24. When asked if Kim Frazier indicated she was afraid to testify, Tara stated that Kim Frazier was very afraid. She further stated that Melissa Johnson was also afraid but that she would testify no matter what. Tara then testified that she, Melissa Johnson, Pam Chizum, Melissa Johnson's mother, and Brian Beeman had all been arrested since September 12, 2013, and that an officer talking to her about her own case indicated that

22

it was "highly unusual" for "all the witnesses to [Chizum's] trial [to] have been arrested a week before his trial." Id. at 25.

On cross-examination, prosecutor David Holmes questioned if the majority of Tara's testimony was what other people had told her, and she responded affirmatively except that she saw Chipman in his vehicle around midnight on September 12, 2013. Prosecutor Holmes stated to the court that his office has officers that do their investigations but that they had received Chizum's witness list on September 13, 2013, and that Chipman needed to speak with those witnesses to see what they were going to say at trial, and specifically stated that his understanding was that Chipman approached "Johnson and Frazier" for that purpose. Id. at 42. Prosecutor Holmes also stated that the people arrested were arrested after having probable cause affidavits approved by a judicial officer, that chronologically the investigations that led to the arrest of these witnesses were not done in relation to receiving Chizum's witness list, and that some investigations had even occurred prior to receiving the list.

Prosecutor Holmes introduced State's Exhibits 3-8 without objection, and the court admitted the exhibits into evidence. State's Exhibits 3 and 4 pertained to Tara, State's Exhibit 3 was an affidavit of probable cause and State's Exhibit 4 was an affidavit for a search warrant on Tara's home. The latter contains references to phone calls received from other residents complaining about Tara's residence, and the dates of the phone calls are prior to September 13, 2013, when Chizum's attorney submitted his witness list. State's Exhibit 5

23

includes a charging information and an affidavit for probable cause regarding Kim Frazier which noted that on September 2, 2013, the manager of a hotel in Marshall County contacted the police regarding a possible meth lab in one of the hotel rooms and that Kim Frazier, who was an employee at the hotel, was arrested based thereon. State's Exhibit 5 also indicates that another person who was unrelated to the case against Chizum was arrested pursuant to the conduct at the hotel. State's Exhibit 7 included a charging information and an affidavit for probable cause related to conduct at the hotel involving dealing in methamphetamine charges against Larry Frazier. State's Exhibit 8 pertained to a charge of driving while suspended against Melissa Johnson. After admitting the exhibits, Prosecutor Holmes stated:

> Your Honor, I'm deeply troubled by these allegations. . . . We try to respond to public concerns in enforcing the law. We do not go beyond the law. We follow the law. We try to comply with all the requirements and that and when somebody uses allegations of ethical violations as a tactical matter in trying to gain advantage in a trial, I frankly think that's despicable. It's accusing us of unethical criminal even conduct that there is absolutely no basis for.

> \* \* \* \* \*

> [W]hen you get a witness list at the last minute from a defense attorney and you have little time to subpoena witnesses, to take depositions, the way you find out what they plan on testifying about is to approach them . . . Chipman approached two (2) witnesses, and, yeah, he did have to track them down because they weren't where they said they would be and he went to ask them questions. That's not violating any law. That's, in fact, doing his job . . . .

Id. at 40-41. Chizum's attorney responded as follows:

> Thank you, Your Honor. First I want to say that there was nothing disingenuous. This wasn't something that I did as a matter of a tactic. I filed

24

this motion reluctantly. I filed this motion because I felt that my obligation to my client required filing it.

As far as the timing is concerned, the trial disclosure that the Court has that I prepared - - that was finished, I signed that on September 11th and it was my understanding it was mailed to the Court and to the Prosecutor's office that same day.

I went out of town the 12th . . . all the way through that weekend, I was out of town. It occurred to me while I was gone that there were witnesses who were in the discovery who I didn't list in my disclosure, so I instructed my secretary to send a letter to Mr. Chipman to let him know that in addition to what's in that disclosure these are some other witnesses who I may call, but those witnesses are already in the discovery.

While I was out of town, I got an e-mail from Mr. Chipman. I believe it was on the 13th saying, well, I never got any disclosure what are you talking about. That day I instructed my secretary to make sure this gets out to him in the mail to him today and also fax it to him that way he has it today. It's my understanding it was faxed on Friday the 13th.

So that's where we get into the timing of all this, and I'm not saying it's unethical in any way for a Prosecutor to try to talk to witnesses. I understand that's customary and probably something that they're obligated to do.

I never had a situation where I give my list of witnesses to the Prosecutor and then the next week and ten (10) days virtually everyone on the list ends up in jail and at the same time I'm getting information from my client's sister indicating that there's this intimidation harassment going on. That's why the motion was filed, and, like I say, this isn't something that I wanted to do. I did this reluctantly. I did it because I felt like I had an obligation to do it, and, obviously, I didn't have all the information that the Prosecutor has presented today concerning these investigations and exactly what the charges are and what they're all based on.

25

Id. at 42-44. The court ruled that it did not find that there had been sufficient evidence by the standard of clear and convincing evidence to show that there had been a conflict of interest or probable cause to believe a crime was committed and denied both motions.

Based on the foregoing, we cannot say that Chizum has proved prosecutorial misconduct in this case. The State admitted into evidence the charging information and probable cause affidavits relating to the witnesses at issue, indicating investigations which predate September 13, 2013, when the defense attorney submitted his witness list. Indeed, the defense attorney admitted that he filed the Motion to Dismiss reluctantly and that he did not have the information, including the State's exhibits, available to him prior to filing the motion. Finally, Chizum does not direct us to authority for the proposition that the prosecutor behaved inappropriately when he attempted to contact various defense witnesses in the days leading up to trial to learn the basis of what they intended to testify to at Chizum's trial. Also, we cannot say that Chizum has demonstrated that he was subjected to grave peril. Accordingly, we conclude that Chizum has not proven prosecutorial misconduct warranting a mistrial.

## CONCLUSION

For the foregoing reasons, we affirm Chizum's convictions for dealing in methamphetamine as a class B felony, possession of methamphetamine as a class D felony, possession of chemical reagents or precursors with intent to manufacture as a class D felony, and maintaining a common nuisance as a class D felony.

26

Affirmed.

VAIDIK, C.J., and NAJAM, J., concur.