**Wayne K. SMITH, Appellant–Defendant,**

**v.**

**STATE of Indiana, Appellee–Plaintiff.**

No. 28A05–1011–CR–704.

Court of Appeals of Indiana.

Aug. 30, 2011.

Kimberly A. Jackson, Indianapolis, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Joby D. Jerrells, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Defendant, Wayne K. Smith (Smith), appeals the trial court's denial of his motion to suppress evidence.

We affirm.

## ISSUE

Smith raises three issues for our review, which we consolidate and restate as the following single issue: Whether the trial court abused its discretion when it denied his motion to suppress evidence.

## FACTS AND PROCEDURAL HISTORY

On August 3, 2009, Detective Joshua Goodman (Detective Goodman) with the Linton Police Department was contacted by Indiana Conservation Officer Tom Lahay (Officer Lahay) in reference to an ongoing investigation. Officer Lahay had been receiving information about a methamphetamine operation from a confidential informant (CI),[1] whom Officer Lahay had known previously because the same CI had provided information in an earlier drug case in 2004. The CI initially met with Officer Lahay on July 25, 2009, about a train derailment in Sullivan County, which had a reward of $20,000 for information leading to an arrest. During their meeting, the CI reported that John Gould (Gould) and Dana Worth (Worth) were involved in the derailment. The CI also told Officer Lahay that Gould had planned to steal an anhydrous ammonia tank from a Co-op for the purpose of manufacturing methamphetamine and wanted to use the CI's pickup truck. The CI asked Officer Lahay if a police agency could provide him with a modified bumper that would allow the CI and Gould to steal the tank by hooking the tank to the CI's truck; however, Officer Lahay refused the CI's request and told the CI not to steal the tank. Officer Lahay was unaware of when the theft was going to occur. After the meeting, Officer Lahay installed an audio-video camera in the CI's pickup truck to record conversations between the CI and Gould.

On August 1, 2009, the CI met up with Gould, and Gould told the CI that he wanted to steal the anhydrous ammonia tank right then. They traveled to Smith's residence, where Smith provided and installed a special bumper for the CI's truck which was needed for the theft. At some point before the theft, the CI called Officer Lahay and informed him that the theft would occur that day. Officer Lahay tried to dissuade the CI, and told the CI that stealing the tank "[was] not a good idea. If you get caught you're going to jail." (Appellant's App. p. 109). However, later that day, the CI and Gould arrived at Crop Production Service Co-op and stole a large tank of anhydrous ammonia.

After stealing the tank, the CI and Gould went to Smith's mobile home, located at R.R. 1 Box 100, Jasonville, Indiana, and pulled the trailer with the tank behind Smith's house. Next to Smith's mobile home were several junk vehicles and a semi-trailer. After dropping off the tank, Smith, the CI, and Gould picked up a red-haired man who brought with him valves that they used to drain the big tank into ten smaller tanks. The CI stated that they hid some of the smaller tanks of anhydrous ammonia in vehicles located on Smith's property. The CI also stated that Smith threatened to kill them if they left his property before the tank was emptied.

On August 2, 2009, Officer Lahay met with the CI to conduct a "debriefing" which was recorded by Officer Lahay. (Transcript p. 9). During this meeting, the CI informed Officer Lahay that the stolen tank was in a field on Smith's property and that Smith intended to destroy it. The CI also provided Smith's address and a description of Smith's home to Officer Lahay. Additionally, the CI stated that the red-haired man drove a white tuck and

---

1. The CI is referred to as a male.

provided Officer Lahay with the license plate number.

The next day, Officer Lahay relayed this information to Detective Goodman. Based on the information provided by the CI and information known to Detective Goodman from previous contact on Smith's property, a search warrant was issued for Smith's residence. Upon arriving, Smith was standing in his front yard. Detective Goodman first searched Smith's person and located money and a metal container containing a white powder-like substance in a plastic corner baggie in his right pant pocket. During the search of the property, officers found the large and small anhydrous tanks, chemicals such as Coleman Camp fuel in a storage trailer next to his residence, a .22 caliber rifle in the living room behind a chair and another in the corner in the back bedroom. Additionally, the officers found several other precursors to manufacturing methamphetamine.

On August 5, 2009, the State filed an Information charging Smith with Count I, dealing in methamphetamine, a Class B felony, Ind.Code § 35–48–4–1.1(a)(1)(A); Count II, unlawful possession of a firearm by a serious violent felon, a Class B felony, I.C. § 35–47–4–5(c); Count II, possession of methamphetamine with a firearm, a Class C felony, I.C. § 35–48–4–6.1(b)(1)(B); Count IV, maintaining a common nuisance, a Class D felony, I.C. § 35–48–4–13(b)(2)(B); Count V, possession of chemical reagents or precursors with the intent to manufacture, a Class D felony, I.C. § 35–48–4–14.5(e); Count VI, receiving stolen property, a Class D felony, I.C. § 35–43–4–2(b); Count VII, transport of anhydrous ammonia, a Class A misdemeanor, I.C. § 22–11–20–6(b); Count VIII, possession of marijuana, a Class A misdemeanor, I.C. § 35–48–4–11(a)(1); and Count IX, possession of paraphernalia, a Class A misdemeanor, I.C. § 35–48–4–8.3(a), (b).

On August 6, 2010, Smith filed a motion to suppress evidence from the search, alleging violations of both the Fourth Amendment of the United States Constitution and Article 1, Section 11 of the Indiana Constitution. On August 10, 2010, a hearing was held. On September 9, 2010, the trial court denied Smith's motion. On October 18, 2010, the trial court certified the September 9th Order for interlocutory appeal. Then, on January 7, 2011, this court accepted the interlocutory appeal.

Smith now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. Standard of Review

A trial court has broad discretion in ruling on the admissibility of evidence, and we will disturb its ruling only where it is shown that the trial court abused its discretion. *Ware v. State*, 782 N.E.2d 478, 481 (Ind.Ct.App.2003). We review the denial of a motion to suppress similar to claims challenging the sufficiency of the evidence. *Washington v. State*, 922 N.E.2d 109, 111 (Ind.Ct.App.2010). We do not reweigh the evidence or reassess the credibility of witnesses, but consider the evidence most favorable to the trial court's ruling and any uncontested evidence favorable to the defendant. *Id.* We will affirm if there is substantial evidence of probative value to support the trial court's decision. *Id.*

### II. Search Warrant

Smith maintains that the search warrant was defective under the Fourth Amendment of the United States Constitution and Article 1, Sec. 11 of the Indiana Constitution. Specifically, Smith argues that (1)

the search warrant affidavit was executed by a police officer who had no contact with the CI, whose credibility was critical to the warrant application, (2) the search warrant's probable cause affidavit contained stale information and multiple levels of hearsay which did not meet the requirements of I.C. § 35–33–5–2(b), and (3) the warrant was obtained through illegal conduct by the CI.

### A. *Fourth Amendment*

The Fourth Amendment to the United States Constitution requires probable cause for the issuance of a search warrant. *Mehring v. State,* 884 N.E.2d 371, 376 (Ind.Ct.App.2008), *reh'g denied.* In deciding whether to issue a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The duty of the reviewing court is to determine whether the magistrate had a "substantial basis" for concluding that probable cause existed. *Id.* at 238–39, 103 S.Ct. 2317. A substantial basis requires the reviewing court, with significant deference to the magistrate's determination, to focus on whether reasonable inferences drawn from the totality of the evidence support the determination of probable cause. *Houser v. State,* 678 N.E.2d 95, 99 (Ind.1997). "A 'reviewing court' for these purposes includes both the trial court ruling on a motion to suppress and an appellate court reviewing that decision." *Query v. State,* 745 N.E.2d 769, 771 (Ind.2001).

Article 1, Section 11 of the Indiana Constitution contains nearly identical language as the Fourth Amendment. These constitutional principles are codified in I.C. § 35–33–5–2, which details the information to be contained in an affidavit for a search warrant. Where a warrant is based upon hearsay information, the affidavit must either:

(1) contain reliable information establishing the credibility of the source and of each of the declarants of the hearsay and establishing that there is a factual basis for the information furnished; or

(2) contain information that establishes that the totality of the circumstances corroborates the hearsay.

The trustworthiness of hearsay for the purpose of proving probable cause can be established in a number of ways, including where: (1) the informant has given correct information in the past, (2) independent police investigation corroborates the informant's statements, (3) some basis for the informant's knowledge is demonstrated, or (4) the informant predicts conduct or activity by the suspect that is not ordinarily easily predicted. *Lanham v. State,* 937 N.E.2d 419, 424 (Ind.Ct.App. 2010). These examples are not exclusive. *Id.* "Depending on the facts, other considerations may come into play in establishing the reliability of the informant or the hearsay." *Id.*

Smith first argues that Detective Goodman had no contact with the CI, and thus, the CI's credibility could not be established. He maintains that the CI was inexperienced, unreliable, and had only provided information to police once before in 2004. The State counters that the CI's trustworthiness and credibility was established when he made a statement against his penal interest—specifically, that he told Officer Lahay that he stole the anhydrous ammonia tank.

The Indiana Supreme Court has held that declarations against penal interest "can furnish sufficient basis for estab-

lishing the credibility of an informant." *Houser v. State*, 678 N.E.2d 95, 100 (Ind. 1997). A statement against penal interest must have "so far tended to subject the declarant to civil or criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." *Id.*

In *State v. Spillers*, 847 N.E.2d 949, 956–57 (Ind.2006), our supreme court clarified that not all admissions of criminal activity amount to statements against penal interest sufficient to support a finding of probable cause. In doing so, the court noted the distinction between cases in which an informant, "after arrest or confrontation by police, admitted committing criminal offenses under circumstances in which the crime otherwise would likely have gone undetected" and those in which the "informant was caught 'red-handed[,]'" where the "tip [is] less a statement against ... penal interest than an obvious attempt to curry favor with the police." *Id.* at 956.

Smith argues that Officer Lahay's conduct made clear to the CI that he would not be subjected to criminal liability for his participation in the theft of the tank. Smith goes a step further and suggests that Officer Lahay even encouraged the CI to steal the tank. He points to the fact that Detective Lahay told the CI after the theft that if the CI was charged, he would try and make it "vanish." (Defendant's Exh. 5, 25:29–26:00).

Here, the circumstances known to the trial court in its determination of admissibility of the evidence resulting from the search include the fact that the CI informed Officer Lahay that Gould had approached him about stealing an anhydrous ammonia tank. Throughout their interactions, Officer Lahay made it clear that he was in no way condoning the CI's involvement in the theft and that there could be serious consequences. When the CI asked Officer Lahay if law enforcement could modify the CI's truck to help with the theft, Officer Lahay refused and told the CI that "[he did not] think it would be in anyone's good judgment to modify [the CI's] vehicle to steal anhydrous." (Appellant's App. p. 143). Additionally, Officer Lahay told the CI that stealing the tank was against the law and that even though the CI was not charged with a felony, the threat of being charged was still hanging over his head. Despite the warnings, the CI followed through and committed the theft for which he could have faced a criminal charge.

It is also clear that the CI was well aware that his actions had consequences. On August 2, 2009, the day after the theft, the CI and Officer Lahay met and the CI appeared to be worried about being charged with theft. During their meeting, the CI stated that while driving with Gould and determining where they were going to steal the tank, the CI tried to convince Gould to commit the crime in their county, otherwise he risked "getting in trouble" and losing his kids. (Defendant's Exhibit 5, 3:36–3:50). Towards the end of their conversation, the following exchange took place:

CI: Now, I can't get in no trouble for doing that like after I called you and let you know and all that?

Officer Lahay: Well, if ... yes, you can, but we'll talk to the prosecutor. If worse comes to worse, if we charge him with it, we may charge you with it ...

CI: Oh, shit.

Officer Lahay: ... and then make it vanish. You see what I am saying?

CI: Then I won't do no time, then?

Officer Lahay: No.

CI: Okay.

(Defendant's Exhibit 5, 25:29–25:45). Despite the fact that Officer Lahay told the

CI that if he was charged with theft, that they would make the changes "vanish," it should be noted that the statement occurred *after* the commission of the crime; not before.

 However, Smith also asserts that the search warrant was defective because Officer Lahay simply relayed information to Detective Goodman, who was not involved in the investigation. Thus, Smith argues, the search warrant affidavit contained multiple levels of hearsay. We have held that "[p]robable cause may be based on the collective information known to the law enforcement organization as a whole." *Davis v. State,* 907 N.E.2d 1043, 1051 (Ind.Ct.App.2009). In *United States v. Ventresca,* 380 U.S. 102, 103, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), the Supreme Court considered whether an affidavit, which contained hearsay reports from investigators at the Internal Revenue Service, was sufficient to establish probable cause. The affidavit stated the following:

> Based upon observations made by me, and based upon information received officially from other Investigators attached to the Alcohol and Tobacco Tax Division assigned to this investigation, and reports orally made to me describing the results of their observations and investigation, this request for the issuance of a search warrant is made.

*Id.* at 103, 85 S.Ct. 741. In its discussion, the Supreme Court disagreed with the lower court's conclusion that the affidavit was supported wholly on unreliable hearsay and stated that "[o]bservations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number." *Id.* at 111, 85 S.Ct. 741.

Smith distinguishes *Ventresca* in his reply brief, arguing that the information in the affidavit which established probable cause for the warrant in *Ventresca* was

based on the direct observations of the various investigators, not from "hearsay from other observers or the investigators' accounts of hearsay from other observers." (Appellant's Reply Br. p. 4).

In this case, the search warrant affidavit was comprised of information obtained from the CI that Smith installed a special bumper on the CI's truck so that the CI and Gould could steal the anhydrous ammonia tank for the purpose of manufacturing methamphetamine. The CI also told Officer Lahay that after they stole the tank, they took it to Smith's house where they emptied the tank into ten smaller tanks and left the tank in Smith's backyard. Officer Lahay relayed this information to Detective Goodman, who had firsthand knowledge that Smith's associates were involved in manufacturing methamphetamine. After the theft, Detective Goodman confirmed that an anhydrous tank had in fact been stolen from the Co-op. Additionally, Detective Goodman ran the license plate of the white truck and corroborated that the truck was registered to a person who fit the description given by the CI. Additionally, Detective Goodman had contact with Smith in May of 2009 when he and another police officer executed an arrest warrant:

> On May 2, 2009, Officer Randy Raney and I received anonymous information that Brent Gilbert was located at Wayne Smith's residence. Brent Gilbert was wanted on two warrants, one out of Sullivan County for Purchase of more than 3 grams of pseudoephedrine in a 7 day period and one out of Vigo County for Possession of Controlled Substance. Upon our arrival, Wayne Smith and Brent Gilbert were standing in the front yard of Wayne's residence. Brent Gilbert was arrested on warrants and searched incident to arrest. During the search of his person, officers located

pseudoephedrine pills, lithium batteries and green plant-like material believed to be marijuana based on my training and experience. Both pseudoephedrine and lithium batteries are precursors used to manufacture methamphetamine.

(Appellant's App. p. 11). Thus, the search warrant was based on personal observations and investigative work of Officer Lahay and that information was confirmed by Detective Goodman.

▮▮▮▮▮ As to Smith's contention that the information regarding Gilbert's arrest is stale, this court has set forth the following analysis for determining whether the information supporting a warrant was stale by the time the warrant was served:

> Although the age of the information supporting an application for a warrant can be a critical factor when determining the existence of probable cause, our courts have not established a bright-line rule regarding the amount of time which may elapse between obtaining the facts upon which the search warrant is based and the issuance of the warrant. Instead, whether the information is tainted by staleness must be determined by the facts and circumstances of each particular case.

*Scott v. State*, 883 N.E.2d 147, 157 (Ind.Ct. App.2008) (quoting *Frasier v. State*, 794 N.E.2d 449, 457 (Ind.Ct.App.2003), *trans. denied*). In the present case, the information in the affidavit regarding Brent Gilbert's arrest, in addition to the information provided by the CI that he and Gould stole a tank of anhydrous ammonia for the purpose of manufacturing methamphetamine, and that they left the tank at Smith's house, would lead a reasonable person to believe that the manufacturing of methamphetamine was occurring on Smith's property. Thus, the search warrant affidavit was supported by probable cause.

## B. *Article 1, Section 11*

▮▮▮▮▮ Finally, Smith argues that the search was unreasonable under Article 1, Section 11 of the Indiana Constitution, which provides, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated...." The purpose of this article is to protect from unreasonable police activity those areas of life Hoosiers regard as private. *State v. Quirk*, 842 N.E.2d 334, 339 (Ind.2006). The provision must receive a liberal construction in its application to guarantee the people against unreasonable search and seizure. *Id.* The legality of a governmental search turns on an evaluation of the reasonableness of the police conduct under the totality of the circumstances. *Litchfield v. State*, 824 N.E.2d 356, 359 (Ind.2005). Although there may well be other relevant considerations, the reasonableness of the search or seizure turns on a balance of (1) the degree of concern, suspicion, or knowledge that a violation has occurred, (2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and (3) the extent of law enforcement needs. *Id.* at 361.

In this case, the totality of the circumstances establishes that the search was reasonable. First, while Smith concedes that police "may have had reason to believe the anhydrous ammonia tank was on Smith's property after the theft[,]" he goes on to argue that this information was learned only after Officer Lahay encouraged the theft. (Appellant's Br. p. 33). Smith directs us to *Osborne v. State*, 805 N.E.2d 435, 440 (Ind.Ct.App.2004), where we held that the police officers' conduct of encouraging the driver, whom they knew had been drinking, to purposely speed through town so that they could stop the car, was so outrageous and unreasonable

so as to preclude evidence seized from the defendant from being admitted at trial.

However, we note a key difference between *Osborne* and the present case. Unlike the officer in *Osborne* who encouraged the defendant to drive recklessly, Officer Lahay "absolutely" did not give the CI his permission to steal the tank. (Appellant's App. p. 149). Officer Lahay repeatedly told the CI that committing this crime could result in a felony conviction:

> I think on a couple different occasions prior to August the 1st he was wanting me to give him permission to participate in the theft and obviously I told him I was not going to give permission nor was I in a position of authority to allow him to commit a felony.

(Appellant's App. p. 149). Officer Lahay also informed the CI that if he stole the anhydrous ammonia tank and was caught that he could certainly go to jail. After the crime was committed, the CI told Officer Lahay the location of the tank. The CI was very specific about stating that Smith directed the CI and others to drain the tank into ten smaller tanks, which were hidden among vehicles on the property. After that, Officer Lahay confirmed that a tank had been stolen from the Co-op. This information was taken to Detective Goodman, who concluded that based on his training and experience, the amount of anhydrous ammonia that was stolen was enough to manufacture methamphetamine several times.

With respect to the degree of intrusion, we acknowledge that a police officer's entry onto one's property and home should not be taken lightly. The police in this case sought and obtained a search warrant for Smith's property. Once they executed the search warrant, they discovered several precursors and materials used for manufacturing methamphetamine. Finally, as to the extent of law enforcement needs, the need in this case to protect the community from the hazards of manufacturing methamphetamine is high. Based on the totality of the circumstances, we conclude that the search warrant did not violate Article 1, Section 11 of the Indiana Constitution.

### *CONCLUSION*

Based on the foregoing, we find that the trial court did not abuse its discretion when it denied Smith's motion to suppress evidence.

Affirmed.

DARDEN, J., and BARNES, J., concur.