

FILED

Jan 06 2017, 8:46 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew J. McGovern
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Mario Deon Watkins, <br> *Appellant-Defendant*, <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff*. | January 6, 2017 <br><br> Court of Appeals Case No. <br> 82A01-1510-CR-1624 <br><br> Appeal from the Vanderburgh <br> Circuit Court <br><br> The Honorable Kelli E. Fink, <br> Magistrate <br><br> Trial Court Cause No. <br> 82C01-1412-F2-5337 |

**Brown, Judge.**

[1] Mario Deon Watkins appeals his convictions for two counts of possession of a controlled substance as class A misdemeanors, possession of cocaine as a level 6 felony, possession of marijuana as a class B misdemeanor, and maintaining a common nuisance as a level 6 felony. Watkins raises two issues, one of which we find dispositive and which we revise and restate as whether the court abused its discretion or erred in admitting evidence discovered as a result of a search. We reverse.

## *Facts and Procedural History*

[2] At some point, a confidential informant told Evansville Police Detective Chris Goergen that he had observed cocaine, marijuana, and a firearm at a residence in Evansville. In the late afternoon or early evening on December 16, 2014, Detective Goergen spoke with the informant who had seen the firearm in the residence earlier that day. The informant confirmed through a photo that Watkins was the individual he saw inside the residence with narcotics and a gun.

[3] On December 17, 2014, Detective Goergen completed an affidavit for a search warrant, which alleged that cocaine and other evidence was being concealed in or about the premises and curtilage located at 314 W. Illinois Street in Evansville. The affidavit alleged:

> Within 48 hours of December 16, 2014, a credible and reliable
> confidential informant (hereinafter "CI") observed more than ten
> (10) grams of crack cocaine inside of 314 W. Illinois St.,
> Evansville, IN. Your Affiant met with CI and had CI direct him
> to the residence in your Affiant's vehicle. Law enforcement has

had prior dealings with Frederick A. Jackson (D.O.B.: 12.26.1985) at 312 W. Illinois St., Evansville, IN. CI advised that Jackson had moved from 312 W. Illinois St. to 314 W. Illinois St., Evansville, IN. As noted above in the description, 312 W. Illinois St. and 314 W. Illinois St. are both located in the same building.

During surveillance on 314 W. Illinois St., Evansville, Indiana in the early morning hours of December 17, 2014, Detectives came to determine that at least one (1) resident of 314 W. Illinois St., Evansville, IN is Mario Watkins (D.O.B.: 8.4.1985). An attempt to secure a photograph of Frederick A. Jackson (D.O.B.: 12.26.1985) for comparison proved fruitless.

With respect to CI's credibility and reliability: CI has been working with Detectives with the Evansville Vanderburgh County Joint Drug Task Force for over one (1) year. The information provided by CI has led to the arrest of numerous individuals involved in narcotics activity. The arrests made on the information provided by CI have resulted in convictions on both the federal and state level. CI has provided information that has been utilized on judicially issued search warrants. Information provided by CI has led to the seizure of multiple pounds of narcotics in the Evansville, Vanderburgh County, Indiana area.

Confidential Exhibits at 28-29. The affidavit also alleged:

Your affiant has learned in his training and experience that persons involved in the dealing of narcotics frequently possess or carry firearms either in trade for narcotics or for protection of their narcotics dealing assets, both product and proceeds.

Your affiant speaks from personal knowledge and observation and believes that the persons giving the information contained

herein speak from personal knowledge and observation and are reliable and credible in that they voluntarily relayed the above information to your affiant in the course of your affiant's duties as a law enforcement officer in an effort to aid in the investigation of this offense.

*Id.* at 33. The trial court granted a search warrant.

[4] Detective Goergen relayed the address, the names of the persons who were possibly inside the building, and that there was a firearm and cocaine seen inside at some point the day before to the assisting investigators and the Evansville SWAT team. In the briefing, the SWAT team were informed that there was a woman and three men inside and a firearm. Evansville Police Detective Michael Gray, a member of the SWAT team, decided with other members of the team how to execute the entry into the house based on information that a gun was seen in the house within the last twenty-four hours, that there were narcotics in the house, and the criminal history of the possible suspects.

[5] On December 17, 2014, Detective Goergen surveilled the house for "an hour, an hour and a half . . . give or take, 15, 30 minutes or so," prior to executing the warrant. Transcript at 34. Another detective surveilling the property informed Detective Goergen that he had seen someone matching Watkins's description exit the house and go out to the back of the house with trash cans and then re-enter.

[6] The SWAT team rode in a Lenco Bearcat that followed a patrol vehicle to the residence. At least a dozen officers were involved. Upon arrival and prior to entry, three officers and a police vehicle approached the rear of the residence and at least nine officers, most armed with assault weapons, approached the front of the residence. At 10:30 a.m., the police knocked on the residence and one of the officers announced, "Police - Search Warrant - Police - Search Warrant," and another officer announced over a loudspeaker "Search Warrant. 314 Illinois." State's Exhibit 1 at 3:55-4:00. One second later, the SWAT team knocked down the door with a battering ram. State's Exhibit 1 at 4.01.

[7] Evansville Police Officer Jacob Taylor, a member of the SWAT team, had a GoPro camera attached to his helmet and recorded the entry. He was responsible for deploying a "flash bang," which is a diversionary device that emits a bright flash and a loud bang. Transcript at 66. He testified that he conducted a quick peek inside, which was the standard procedure, and saw a couch, a TV, and some other things that were "kind of past the couch and then just next to the couch was the floor and there wasn't anything in the floor," and he did not see any children. *Id.* at 67. Detective Gray testified that he paused at the front door, "actually kind of worked the angle, as [he] was standing covering the front door [he] could see down the right wall on the right side of the room but [he] couldn't see what was to the left" and did not know who was in the room. *Id.* at 55. One of the officers announced: "Flash bang, flash bang,

flash bang."[1] State's Exhibit 1 at 4:00-4:05. Officer Taylor set or "basically dropped" or tossed the flash bang,[2] which has a time delay of one and one-half seconds and is designed to interrupt a person's ability to observe, decide, and act, "right there at the front door, the bottom left hand corner just inside the residence." Transcript at 56, 83. The device activated six inches inside the door and emitted a "pretty loud" noise and a flash of light. *Id.* at 59. After the flash bang grenade was deployed, Detective Gray entered the residence and picked up a nine-month old baby crying on top of blankets in a playpen just inside and "very close to the door." *Id.* at 332. The room also contained a baby's car seat and a toddler's activity center in the line of sight of the front door. One of the officers moved the car seat with his foot to proceed further into the residence. Officer Taylor took the baby out of the house, handed the baby to a woman dressed in street clothes, and then returned to the house. Meanwhile, other officers smashed in the kitchen window and threw another flash bang grenade inside that filled the room with smoke and set off the smoke detectors.

[8]     Detective Gray encountered Watkins laying on a bed in a room towards the middle of the house. Watkins offered no resistance, and Detective Gray and Officer Kennedy detained him until the SWAT team completed clearing the

---

[1] The first statement of the phrase "flash bang" occurred while the door was not fully open. State's Exhibit 1 at 4:00-4:05.

[2] The video of the placing of the flash bang into the residence reveals some forward motion of the device.

house. Two other men and a woman were discovered in the back of the house. The police also broke open a locked door leading to the laundry room.

[9] Before receiving his *Miranda* warnings and while the police were bringing him out and sitting him on the curb outside, Watkins stated that everything in the house belonged to him and that "they have nothing to do with it." *Id.* at 313. Detective Gray read Watkins his *Miranda* rights, and Watkins said that he understood his rights. Detective Goergen asked him if he had been advised of his *Miranda* warnings, and he again stated that everything in the house was his, that he could show him where everything was, and that he could give him information on other drug dealers in return for not taking him to jail or charging him. The police discovered narcotics and marijuana, a digital scale, a cut corner baggie, cocaine, and a .40 caliber handgun.

[10] On December 19, 2014, the State charged Watkins with Count I, dealing in a schedule II controlled substance as a level 2 felony; Count II, dealing in cocaine as a level 3 felony; Count III, unlawful possession of a firearm by a serious violent felon as a level 4 felony; Count IV, dealing in a schedule IV controlled substance as a level 4 felony; Count V, dealing in marijuana as a level 6 felony; Count VI, maintaining a common nuisance as a level 6 felony; and Count VII, neglect of a dependent as a level 6 felony. On August 25, 2015, the State filed an amended Count II alleging that the offense was committed in the presence of a minor.

[11]   Watkins filed a motion to suppress on March 6, 2015, and an amended motion on April 13, 2015. He alleged that the seizure of the items was without lawful authority because the search was conducted pursuant to an invalid warrant, the manner of the search and execution of the warrant violated the Fourth Amendment to the United States Constitution and Article 1, Sections 11, 13, and 14 of the Indiana Constitution, and the affidavit of probable cause filed to support the issuance of the warrant was insufficient to establish probable cause. He also alleged that his statements were made without being adequately advised of his *Miranda* rights.

[12]   On May 4, 2015, the court held a hearing on Watkins's motion to suppress. Detective Goergen testified that he had worked with the confidential informant extensively over the course of sixteen to eighteen months, that the informant "by all accounts and everybody in the drug task force has been established as one of the most credible informants in the history of the drug task force," and that the informant's information has led to the arrest of dozens of individuals and convictions. Transcript at 22. Detective Goergen also testified that, prior to the execution of the search warrant, Detective Watson was able to locate the name of Mario Watkins as being involved at 314 W. Illinois, Detective Goergen forwarded a picture of Watkins to the informant, and the informant confirmed that Watkins was the individual to whom he was referring.

[13]   Detective Gray testified, and when asked if he recalled the criminal history of the occupants, he answered: "No I don't, I mean I think there was some sort of drug history and a violent act but I can't say for sure." *Id.* at 51. He testified

that he did not toss the flash bang into the residence but that "whoever is charged with ensuring that they deploy [a distraction] device is also charged with ensuring that they deploy it into a safe area" and that "you wouldn't want to throw it on any children, you wouldn't want to throw it if there was a meth lab, flammable's [sic], bond [sic] making materials, different things like that, so it is the job of the operator that's actually deploying the device to do the quick peek to check." *Id.* at 63. He also acknowledged that the flash bang could catch a carpet on fire.

[14] Officer Taylor testified that he had been with SWAT for eight years and that before he deploys a flash bang and as the door is breached "there's a quick peek, a lot of things were [sic] looking for, people, kids, elderly, smells, and then it gets placed there at the threshold." *Id.* at 66-67. When asked if he believed that he complied with the safety protocol, Officer Taylor testified: "Yes, even more so than our standards are." *Id.* at 73. He also stated that the SWAT team carries a fire extinguisher.

[15] The court admitted the video from the camera that was mounted to Officer Taylor's helmet as State's Exhibit 1. Officer Taylor testified that his perception of things involved a much wider view than what the camera could see. At a time stamp of 4:01 on the video, a member of the SWAT team rammed the door open several inches with a battering ram. From an angle to the right, Officer Taylor tossed the flash bang into the house at 4:02, and it detonated at 4:04. The video at 4:02 shows only a portion of the right rear of the couch and the wood floor on which it sat. The video reveals that about five minutes after

the initial entry someone stated: "Make sure you get a picture . . . are you taking a picture of that?" State's Exhibit 1 at 8:50-8:55. This appears to be a reference to a charred stain on the floor. The person then stated: "Because the baby was in this room, but I put it right there for a reason." *Id.* at 8:55-9:00.

[16] On cross-examination, Officer Taylor testified that his vantage point was what was on the video because the camera was mounted to his helmet. After the video was played, Watkins's counsel asked Officer Taylor: "So you're saying from the angle depicted there you could see inside that room?" Transcript at 82. Officer Taylor answered: "I can see, I can see from the couch over to the left, I can't see the corner, the left corner inside the room and I can't see the hallway in front of it, that's why the flash bang goes in the threshold." *Id.* at 82-83.

[17] On May 22, 2015, the court denied Watkins's motion to suppress. On May 26, 2015, Watkins filed a motion for interlocutory appeal. The trial court certified the order, and this court denied Watkins's motion for leave to appeal from the interlocutory order.

[18] On August 17, 2015, the State filed a motion in limine arguing that the introduction of evidence that a flash bang grenade was deployed in the same room where Watkins's small child was located would be objectionable, highly prejudicial, and irrelevant. The court found that the means of entry into the home had some relevance to the case and stated that it would allow testimony regarding the use of the SWAT team to make entry into the home and the

location of the individuals, including the child, in the home at the time of entry. The court also found that the use of a flash bang grenade had little or no relevance to the charged offenses and that the prejudicial effect of such evidence outweighed any probative value of the evidence.

[19] In August 2015, the court held a jury trial during which Watkins referred to his motion to suppress and objected to any evidence seized from the house including statements made by those who were extracted from the house. The court incorporated Watkins's earlier arguments and allowed him to make a continuing objection.

[20] After the State rested and outside the presence of the jury, Watkins's counsel questioned Detective Goergen regarding the video of the search and the location of the baby. Detective Goergen testified: "I think you can see like the octagon shaped playpen, I know where the baby was at, it was very close to the door." *Id.* at 332. Watkins's counsel argued that "this tape would tend to show that the child was not in the physical presence of any controlled substances at that time because there were no controlled substances found in the living[ ]room." *Id.* at 336. The prosecutor argued that the only purpose of introducing the video was to show the flash bang grenade and the violent nature of the SWAT entry and that such violated the court's order on the motion in limine. The court indicated that it would not allow the flash bang evidence, and that a portion of the video could be played without evidence of the flash bang. A portion of the video between 4:20 and 4:30 on the recording, which showed Officer Taylor picking up the baby and exiting the residence, was played for the

jury without sound. The defense then rested and moved for a motion for judgment on the evidence, and the court denied the motion.

[21] The jury found Watkins guilty of the lesser-included offense of possession of a schedule II controlled substance as a class A misdemeanor, the lesser-included offense of possession of cocaine as a level 6 felony, the lesser-included offense of possession of a schedule IV controlled substance as a class A misdemeanor, the lesser-included offense of possession of marijuana as a class B misdemeanor, and maintaining a common nuisance as a level 6 felony. The State moved to dismiss the possession of a firearm by a serious violent felon and neglect of a dependent counts, and the court dismissed those counts.

[22] On September 23, 2015, the court sentenced Watkins to an aggregate sentence of two years executed at Vanderburgh County Work Release.

## Discussion

[23] The issue is whether the trial court abused its discretion in admitting evidence discovered as a result of the search. Generally, we review the trial court's ruling on the admission or exclusion of evidence for an abuse of discretion. *Roche v. State*, 690 N.E.2d 1115, 1134 (Ind. 1997), *reh'g denied*. We reverse only where the decision is clearly against the logic and effect of the facts and circumstances. *Joyner v. State*, 678 N.E.2d 386, 390 (Ind. 1997), *reh'g denied*. In reviewing the trial court's ruling on the admissibility of evidence from an allegedly illegal search, an appellate court does not reweigh the evidence but defers to the trial court's factual determinations unless clearly erroneous, views conflicting

evidence most favorably to the ruling, and considers afresh any legal question of the constitutionality of a search or seizure. *Meredith v. State*, 906 N.E.2d 867, 869 (Ind. 2009).

[24]  In ruling on admissibility following the denial of a motion to suppress, the trial court considers the foundational evidence presented at trial. *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014). If the foundational evidence at trial is not the same as that presented at the suppression hearing, the trial court must make its decision based upon trial evidence and may consider hearing evidence only if it does not conflict with trial evidence. *Guilmette v. State*, 14 N.E.3d 38, 40 n.1 (Ind. 2014).

[25]  Article 1, Section 11 of the Indiana Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

[26]  Although its text mirrors the federal Fourth Amendment, we interpret Article 1, § 11 of our Indiana Constitution separately and independently. *Robinson v. State*, 5 N.E.3d 362, 368 (Ind. 2014). "When a defendant raises a Section 11 claim, the State must show the police conduct 'was reasonable under the totality of the circumstances.'" *Id.* (quoting *State v. Washington*, 898 N.E.2d 1200, 1205-1206 (Ind. 2008), *reh'g denied*). Generally, "[w]e consider three factors when evaluating reasonableness: '1) the degree of concern, suspicion, or

knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs.'" *Id.* (quoting *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005)).[3] "[T]he degree of intrusion may render a search unreasonable, even where law enforcement needs are obviously present." *Litchfield*, 824 N.E.2d at 360.

[27] Watkins argues that the officers' military-style assault that involved announcing their presence seconds before crashing through the door with a battering ram and then one second later tossing a flash bang grenade into the front room of the house, which contained only a nine-month old baby, was an unreasonable use of force in the execution of the search warrant. He argues that there was little evidence that this case involved a high risk entry, and that while Officer

---

[3] The State argues that the factors discussed in *Litchfield* are inapplicable under the facts of this case because the search discussed in *Litchfield* was a warrantless search and the three factors are relevant to a determination of reasonableness when a warrantless search occurs. *See* Appellee's Brief at 25 (citing *Mehring v. State*, 884 N.E.2d 371, 381 n.4 (Ind. Ct. App. 2008), *reh'g denied*, *trans. denied*). The State asserts that the manner of the search still has to be reasonable under the totality of the circumstances and that even if this Court were to find that the factors in *Litchfield* apply, the factors are satisfied here. In *Mehring*, the Court noted that the defendant referenced the three factors discussed in *Litchfield* as applicable to a determination of a staleness issue and whether there was probable cause for the issuance of a search warrant. 884 N.E.2d at 381 n.4. The Court then stated: "Because the search discussed in *Litchfield* was a warrantless search and the three factors are relevant to a determination of reasonableness when a warrantless search occurs, we do not agree that they are applicable under the facts of this case." *Id.* In *Lacey v. State*, the Court addressed a defendant's challenge to the trial court's denial of his motion to suppress evidence obtained from the execution of a search warrant by police. 946 N.E.2d 548, 548 (Ind. 2011), *reh'g denied*. In its analysis, the Court referenced the *Litchfield* factors. *Id.* at 550. *See also Smith v. State*, 953 N.E.2d 651, 659 (Ind. Ct. App. 2011) (addressing a search conducted pursuant to a warrant, citing *Litchfield* for the propositions that the legality of a governmental search turns on an evaluation of the reasonableness of the police conduct under the totality of the circumstances and that although there may well be other relevant considerations, the reasonableness of the search or seizure turns on a balance of (1) the degree of concern, suspicion, or knowledge that a violation has occurred, (2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and (3) the extent of law enforcement needs), *trans. denied*. We cannot say that the *Litchfield* factors do not apply.

Taylor claimed that he peeked in the room before tossing the grenade, his video belies this claim. He also asserts that the no-knock entry was unreasonable.

[28] The State argues that the use of the flash bang device was not a part of the search and to the extent the use of the device caused any harm, this could be the basis of a civil suit but should not be a vehicle for the suppression of the evidence. It also argues that, to the extent the use of the device was a part of the search, its use was reasonable given that the police had received reliable information that there was marijuana and ten grams of cocaine inside Watkins's residence, that Watkins had a firearm, and that the possible suspect inside the residence had a criminal history of a violent act. The State notes that Officer Taylor, who deployed the flash bang device, testified that he looked inside first and only deployed the grenade when he did not see anyone in the front room. The State asserts that, even though the video shows that there was a baby in the front room, this may not have been clear to Officer Taylor at the moment of entry because the baby was on the floor in an enclosed playpen-type area and at least partially hidden by the white plastic lattice bars of the playpen. The State contends that this was not a no-knock entry as the officers announced their presence and then waited a few seconds before they broke through the front door. It also asserts that even if this had been a no-knock entry, it would have been reasonable given that officers knew that cocaine and marijuana were present at the residence and that they could be facing an armed and dangerous individual. The State also suggests that we adopt the inevitable discovery/independent source exception as a matter of Indiana constitutional

law. In reply, Watkins asserts that the inevitable discovery doctrine has not been adopted as a matter of Indiana constitutional law and that this Court has expressly refused to adopt it.

[29] Applying the factors articulated in *Litchfield*, we first consider "the degree of concern, suspicion, or knowledge that a violation has occurred." *Litchfield*, 824 N.E.2d at 361. According to the affidavit, a credible and reliable confidential informant observed more than ten grams of crack cocaine inside the residence within forty-eight hours of December 16, 2014, the day before the warrant was executed. The informant confirmed through a photograph that Watkins was the individual he saw inside the residence with narcotics and a gun. The informant also observed marijuana, but the record does not reveal when the informant observed the marijuana or whether Watkins or Jackson personally possessed the marijuana or attempted to sell it to the informant.

[30] Regarding the degree of intrusion, we agree with Watkins's characterization of the execution of the search warrant as a "military-style assault." Appellant's Brief at 25. The record reveals that at least a dozen officers surrounded the residence, most of whom were armed with assault weapons. At the front door, the officers knocked and announced their presence seconds before using a battering ram to crash open the front door and then tossed a flash bang device inside the residence no more than one second later and in a room containing a nine-month old baby in a playpen. That room which the SWAT team entered also contained a baby's car seat and a toddler's activity center in the line of sight of the front door. One of the officers announced: "Flash bang, flash bang, flash

bang." State's Exhibit 1 at 4:00-4:05. The first statement of the phrase "flash bang" occurred while the door was not fully open. State's Exhibit 1 at 4:00-4:05. The video shows almost no time lapse between when the door was battered in and the tossing of the flash bang. The door was barely opened when the flash bang was immediately tossed into the room, and the angle at which Officer Taylor was standing to the door did not allow him an opportunity to see what was inside the room. Indeed, Officer Taylor acknowledged that he could not see portions of the room in which the flash bang was placed. Specifically, he testified that he could see "from the couch over to the left, I can't see the corner, the left corner inside the room and I can't see the hallway in front of it, that's why the flash bang goes in the threshold." Transcript at 82-83. The audio from the recording reveals what appears to be Officer Taylor stating: "Because the baby was in this room, but I put it right there for a reason." State's Exhibit 1 at 8:55-9:00. Officer Taylor took the baby out of the house and handed the baby to a woman dressed in street clothes.

[31] While Officer Taylor testified that that the burn mark from the flash bang can be seen six inches inside the door, Detective Goergen testified: "I think you can see like the octagon shaped playpen, I know where the baby was at, it was very close to the door." Transcript at 332. Other officers smashed in the kitchen window and threw a flash bang grenade inside that filled the kitchen with smoke and set off the smoke detectors. They handcuffed Watkins and took him outside to sit on the curb. They searched his house, breaking open a locked door leading to the laundry room in the process.

[32]     As to the extent of law enforcement needs, the officers were aware that the informant had reported observing more than ten grams of cocaine and marijuana in the residence. Detective Goergen testified that the informant told him that he also saw a firearm in the residence on the 16th, the day before the warrant was executed. Officer Taylor testified that the SWAT team held a briefing before entering the residence and their planning information indicated that there were three males and a woman inside. As to the criminal histories of Watkins and the others, the affidavit asserts that "[l]aw enforcement has had prior dealings with Frederick A. Jackson," but it did not specifically describe the contents of these prior dealings. Confidential Exhibits at 28. During direct examination, Detective Gray testified that they decided on how they were going to execute the entry into the house based upon the information they were given by the case agent and detectives. The following exchange then occurred:

> Q  When you said based on information that was provided by the case agent and other assisting officers, what information are you referring to?
>
> A  Information that a gun was seen in the house very recently, as I recall within the last 24 hours, and narcotics being in the house and then the possible suspects, the criminal history involved there.
>
> Q  Do you recall what the criminal history was?
>
> A  No I don't, I mean I think there was some sort of drug history and a violent act but I can't say for sure.

Transcript at 51. During cross-examination of Detective Gray, the following exchange occurred:

> Q You mentioned prior criminal history as one of the factors in your determination for the method of entry but you don't recall exactly what that was, you don't recall exactly what his criminal record was?
>
> A No, I'm fairly certain it's documented on the . . .
>
> Q It is.
>
> A Okay.
>
> Q It is.
>
> A But I don't, I don't recall it.
>
> Q Did he have a conviction for burglary and robbery in the year of 2004?
>
> A I would have to look at his record.
>
> Q Do you know if he had any other criminal record?
>
> A I don't.

*Id.* at 62. The State does not point us to any other evidence indicating the criminal history of Watkins or the other occupants of the house. The record contains no evidence that law enforcement could not have safely presented the

person matching Watkins's description with the search warrant during the time that he was outside the house and before he re-entered it.

[33] Comparing the factors, we conclude that while there was a considerable degree of suspicion, the extent of law enforcement needs for a military-style assault was low and the degree of intrusion was unreasonably high. Under these specific circumstances and particularly in light of the use of a flash bang grenade in the same room as a nine-month old baby who was "very close" to where the flash bang was deployed, the State has not demonstrated that the police conduct was reasonable under the totality of the circumstances. We conclude that the search violated Watkins's rights under Article 1, Section 11 of the Indiana Constitution and that the trial court erred in admitting the evidence discovered as a result of the search.[4]

[34] To the extent the State suggests that we adopt the inevitable discovery exception as a matter of Indiana constitutional law, we observe that under the Fourth Amendment, the inevitable discovery exception to the exclusionary rule "permits the introduction of evidence that eventually would have been located had there been no error, for [in] that instance 'there is no nexus sufficient to provide a taint.'" *Shultz v. State*, 742 N.E.2d 961, 965 (Ind. Ct. App. 2001) (quoting *Banks v. State*, 681 N.E.2d 235, 239 (Ind. Ct. App. 1997) (quoting *Nix v. Williams*, 467 U.S. 431, 438, 104 S. Ct. 2501 (1984))), *reh'g denied*, *trans.*

---

[4] Because we find that the search violated Watkins's rights under Article 1, Section 11 of the Indiana Constitution, we need not address his argument that the search warrant affidavit lacked probable cause.

*denied*. However, the inevitable discovery exception has not been adopted as a matter of Indiana constitutional law. *Ammons v. State*, 770 N.E.2d 927, 935 (Ind. Ct. App. 2002), *trans. denied*. The Indiana Supreme Court has held that "our state constitution mandates that the evidence found as a result of [an unconstitutional] search be suppressed." *Brown v. State*, 653 N.E.2d 77, 80 (Ind. 1995). *See also Grier v. State*, 868 N.E.2d 443, 445 (Ind. 2007) ("Evidence obtained as a result of an unconstitutional search must be suppressed."). Despite the State's request, we are not inclined to adopt the inevitable discovery rule as part of Indiana constitutional law in light of the Indiana Supreme Court's firm language. *See Gyamfi v. State*, 15 N.E.3d 1131, 1138 (Ind. Ct. App. 2014) (declining to adopt the inevitable discovery rule as part of Indiana constitutional law in light of the Indiana Supreme Court's firm language in *Brown*), *reh'g denied*; *Ammons*, 770 N.E.2d at 935.

### *Conclusion*

[35] For the foregoing reasons, we reverse Watkins's convictions.

[36] Reversed.

Baker, J., concurs.

May, J., dissents with separate opinion.

ATTORNEY FOR APPELLANT

Matthew J. McGovern
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Mario Deon Watkins,<br>*Appellant-Defendant*,<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | Court of Appeals Case No.<br>82A01-1510-CR-1624 |

**May, Judge, dissenting.**

[37] Unlike my colleagues, I would hold the search of Watkins' residence was reasonable under the totality of the circumstances. I therefore respectfully dissent.

I believe the majority's analysis underestimates "the extent of law enforcement needs." *Powell v. State*, 898 N.E.2d 328, 336 (Ind. Ct. App. 2008), *trans. denied*. The confidential informant, whose credibility had been established, reported meeting Watkins at the house to be searched less than twenty-four hours before the search was to be conducted and, at that time, Watkins was in possession of a handgun. Police believed three men and a woman would be in the house.[5] Detective Gray recalled that Watkins had a criminal history that included a violent crime and he remembered considering that information as the SWAT team decided how to enter the residence.[6] Detective Goergen testified "the fact

---

[5] The majority suggests police should have served the search warrant on "the person matching Watkins' description . . . during the time that he was outside of the residence." *Slip op*. at 21, ¶ 32. However, the record does not indicate: (1) how many officers were near the residence conducting surveillance when the man who looked like Watkins exited the back of the house; or (2) whether those officers possessed a copy of the search warrant to serve. I simply do not believe we should expect what may have been only one or two police officers to serve a search warrant on a man outside a house thought to have three additional adult occupants, at least one gun, and large quantities of drugs that could be destroyed while the premises are being secured.

[6] I also disagree with my colleagues' assessment of the evidence about Watkins' criminal history. When asked about Watkins' criminal history, Detective Gray said, "I think there was some sort of drug history and a violent act but I can't say for sure." (Tr. at 51.) When asked again on cross-examination, Detective Gray said, "I'm fairly certain it's documented," (*id*. at 62), and defense counsel responded, "It is." (*Id*.) Thus, the question is not "whether" Watkins has a criminal record, only "which crimes" his record contains.

The charging information alleged Watkins was guilty of possession of a firearm by a serious violent felon because he had a conviction of "Burglary Resulting in Bodily Injury in Cause Number 82D02-0403-FA-200." (App. Vol. 1 at 20.) The trial court had granted Watkins' motion to sever that count from the other charges for trial, (*id*. at 7), and had refused to lower Watkins' bond after a hearing in which Watkins' counsel asked him if he was serving probation or parole for the "prior conviction of burglary in 2014," (*id*. at 5), and Watkins replied, "It was 2004." (*Id*.) The State's memorandum in opposition to the motion to suppress noted:

> At the time the warrant was executed, officers knew that the Defendant had a prior conviction for Burglary as a B felony, which makes the Defendant a serious violent felon. Officers also knew that one of their most credible and reliable informants had seen the Defendant inside the residence with the firearm the evening prior to making entry. The Defendant's possession of a firearm with his status as a serious violent felon is a crime in and of itself and presents an alarming danger to officers' safety.

that there was a firearm on Mr. Watkins didn't necessarily in my opinion enhance probable cause for the search warrant but it was a, it's a safety issue for the investigators." (Tr. Vol. 2 at 37.) Because the police were executing a search warrant on the home of a convicted violent felon believed to be in possession of a handgun and a large amount of illegal drugs, I would conclude the law enforcement need was high.

[39] In light of the manner in which the search warrant was executed, I conclude the degree of intrusion into Watkins' privacy was high, but not "unreasonably" so. *Cf. slip op.* at 21, ¶ 33 ("the degree of intrusion was unreasonably high"). Police had already obtained a search warrant, which allowed them to enter Watkins' home, breaking down the door if necessary, and search in any spot that might conceal drugs. Thus, regardless of the precise manner of execution, police had been given authority to intrude into Watkins' personal residence, drag him outside in handcuffs, and turn his residence upside down.

[40] Furthermore, while I expect the police would never *knowingly* detonate a flash bang near a child,[7] I do note that the principal function of a flash bang is "to

(*Id.* at 36.) While none of this information is evidence that *proves* Watkins had a criminal record that included a violent crime, it demonstrates the officers conducting the search had reason to believe Watkins had been convicted of a violent felony as they were determining how to execute the search warrant.

Finally, if the trial court doubted the existence of Watkins' Class B felony burglary conviction under Cause Number 82D02-0403-FA-200, it could have taken judicial notice of that fact, just as we may. *See* Ind. Evidence Rule 201; (App. Vol. 2 at 189 (PSI demonstrates Watkins pled guilty to Class B felony burglary resulting in bodily injury in 2004).)

[7] As the Seventh Circuit has noted, "potentially serious injuries . . . may arise from the use of a flash-bang device during a search." *United States v. Folks*, 236 F.3d 384, 388 (7th Cir. 2001) (citing cases involving injuries), *cert. denied* 534 U.S. 830 (2001). "Children are especially vulnerable" to injury if they are near the

protect officers from weapons fire," *United States v. Jones*, 217 F.3d 836, 838 (7th Cir. 2000), and that our Section 11 analysis of reasonableness should "include consideration of police officer safety." *Mitchell v. State*, 745 N.E.2d 775, 786 (Ind. 2001). As the *Mitchell* court noted:

> In construing and applying "unreasonable" under Section 11, we recognize that Indiana citizens have been concerned not only with personal privacy but also with safety, security, and protection from crime. Indeed, the Indiana Constitution was adopted to the end that "justice be established, public order maintained, and liberty perpetuated." Ind. Const. preamble. Its framers and ratifiers declared in Article 1 of its Bill of Rights that government is "instituted for [the people's] peace, safety, and well-being." Ind. Const. art. 1, § 1.

*Id.* (modifications in original). If we are going to ask police officers, as protectors of the general public's safety and security, to enter the home of four adults, one of whom is a violent felon in possession of a handgun who sells drugs out of the house, I believe we must allow those officers some means by which to protect themselves from the danger that can be inherent in such an entrance.

There certainly could be cases in which the use of a flash bang device may render a search constitutionally unreasonable. But this is not such a case. My

---

detonation location. *United States v. Jones*, 214 F.3d 836, 838 (7th Cir. 2000) (refusing to suppress evidence in criminal trial based on inevitable discovery doctrine). Detonation of flash bang grenades near innocent people has led to tort claims against the government. *See, e.g., Milan v. Bolin*, 795 F.3d 726 (7th Cir. 2015) (police officers are not shielded from liability by qualified immunity when their execution of a search warrant was unreasonable), *cert. denied* 136 S. Ct. 1162 (2016).

analysis of the *Litchfield* factors leads me to conclude the search of Watkins' house was reasonable under the totality of the circumstances. Accordingly, I see no error in admitting the evidence gathered pursuant to the search warrant in Watkins' criminal trial, and I respectfully dissent.